# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-3669

_____

United States of America,

          Appellee,

v.

Erroll Flynn Shepard,

          Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeals from the United States
District Court for the
District of Nebraska.

_____

No. 04-3693

_____

United States of America,

          Appellee,

v.

Tony Skannell, also known as Tomcat,

          Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

[PUBLISHED]

_____

No. 05-1024

_____

United States of America,

        Appellee,

v.

Barry Renfold Cooley

        Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


_____

No. 05-1827

_____

United States of America,

        Appellee,

v.

Roy G. Straughan, also known as
George Clark, also known as
C-Note (3), also known as
C-Nutt (3),

        Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

_____

Submitted: January 9, 2006
Filed: September 11, 2006

_____

Before LOKEN, Chief Judge, HANSEN and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Erroll Flynn Shepherd,[1] Tony Skannell, Barry Cooley, Roy Straughan, Vincent Brown, and Oraina Fellows were indicted by a federal grand jury on one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base between November 1, 2000, and November 5, 2001, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), 846. Brown and Fellows entered into plea agreements with the Government and testified against the appellants, while the other four proceeded to trial. Trial began on May 19, 2004, and a jury returned verdicts of guilty against all four appellants on May 28, 2004. The jury also found that the conspiracy involved 50 grams or more of a mixture or substance containing cocaine base. Cooley was sentenced to life in prison and Shepherd, Straughan, and Skannell were each sentenced to 360 months of imprisonment. All four appeal, raising multiple issues. For the reasons set forth herein, we affirm the conspiracy conviction as to each appellant and the sentences of Straughan and Cooley, but we vacate the sentences of Shepherd and Skannell and remand their cases to the district court for resentencing.

_____

[1]Shepherd was indicted and referred to as "Shepard" throughout the proceedings prior to this appeal. However, it appears the correct spelling is "Shepherd" and that spelling will be used throughout this opinion.

I.

A large number of pretrial motions were filed in this case, many by the appellants, and that, along with the number of defendants involved, caused several delays in setting a trial date. While the indictment was filed on October 24, 2002, the joint trial did not commence until May 19, 2004. Shepherd successfully petitioned to represent himself and proceeded pro se, with standby counsel appointed to assist if requested, while the other three defendants were represented by counsel.

At trial, the Government offered the testimony of five alleged coconspirators to establish the conspiracy, and also presented the testimony of Officer Steve Orsi of the Omaha, Nebraska, Police Department. Because each of the appellants challenges the sufficiency of the evidence as to him, we provide a rather thorough account of the testimony from the trial, which we present "in the light most favorable to the jury verdict, as we are required to do." United States v. Milk, 447 F.3d 593, 596 (8th Cir. 2006).

Officer Orsi testified that he had been assigned to the Narcotics Unit for five years and primarily worked long-term investigations, many of which involved conspiracies. He testified about his experience as a narcotics officer investigating long-term drug conspiracies and how he conducted such investigations himself. Over an objection, Officer Orsi testified as to what the average cost in Omaha was to purchase powder cocaine and crack, and what he understood to be "dealer amounts" of narcotics as opposed to drug amounts for individual use. Officer Orsi also testified as to how investigations into drug conspiracies are generally conducted, including how officers work to corroborate the stories of witnesses and coconspirators, why investigators work with individuals charged with drug crimes, and what evidence investigators use in such investigations.

Oraina Fellows, who entered into a plea agreement two days before trial, testified against the appellants. She testified that from September 1999 to October 2001 she lived in an apartment in Omaha, Nebraska. She met Shepherd in 2000 through Anthony Wiley, a man she was dating at the time. Fellows testified that Shepherd and Wiley would cook powder cocaine into crack in her apartment. Shepherd and Fellows later became romantically involved, and in December 2000, Shepherd asked Fellows to rent the apartment across the hall from her place for him. Shepherd arranged to pay the rent and utilities. Fellows stated that between December 2000 and April or May 2001, Shepherd and others would come and go from her apartment and the apartment across the hall, sometimes staying for a couple of weeks at a time.

Soon after she rented the apartment for Shepherd, Fellows stated that Skannell moved into it. She also saw Straughan at the apartment at various times. Fellows testified that she saw all four defendants at the apartment across the hall cooking powder cocaine into crack. Shepherd would give Fellows money to pay bills and buy groceries, and Fellows prepared meals for the people staying in the other apartment. Shepherd also often asked Fellows to obtain the items necessary to cook the powder into crack. She testified that Straughan accompanied her on one trip to obtain such materials, as did Cooley on another trip. Fellows maintained that she did not participate in the cooking process.

Fellows testified that she saw Shepherd with a package of what she believed to be powder cocaine or crack in May 2001, and that she thought he received similar packages several times from April 2001 through the end of that summer. She estimated that during that time she saw Skannell give Shepherd such a package three or four times and Cooley give packages to Shepherd more than twice. Fellows began to see less of Skannell and Cooley in September or October 2001, and Shepherd told her that he had had a falling out with the two men over a cocaine cooking session that had occurred at the apartment without Shepherd's knowledge or participation.

Throughout the spring and summer of 2001, Fellows estimated that she was in the apartment across the hall and saw powder cocaine being cooked into crack more than two times but less than ten. She also testified that during those times all four defendants were present, along with various other people. Fellows also admitted that she herself was using powder and crack cocaine two or three times a day from December 2000 through October 2001, as well as smoking marijuana and drinking alcohol.

Fellows testified that she observed Cooley pass money to Shepherd more than once between December 2000 and September 2001. In that same time period, she saw Skannell give Shepherd money multiple times at the apartment in Omaha and twice in Los Angeles. She did not see Straughan give money to Shepherd, but she did observe Vincent Brown pass money to Shepherd numerous times.

Curtis Holmes testified for the Government. He stated that he was testifying pursuant to a plea agreement and that he believed the terms of his plea agreement required that he cooperate with law enforcement and talk about his involvement with the appellants. Holmes stated he had been sentenced to 292 months of imprisonment, that the judge could still lower his sentence, and that he had two prior federal convictions—a felony crack cocaine conviction and a conviction for being a felon in possession of a firearm.

Holmes testified that he was acquainted with all four defendants. He first met Shepherd in March 2001 when he had some cocaine powder he wanted to cook into crack. Shepherd and Holmes' cousin cooked nine ounces of cocaine powder into 15 or 16 ounces of crack cocaine for Holmes. As payment for the cooking, Holmes gave 3 or 4 ounces of crack to the men. Holmes then saw Shepherd again in May or June 2001 at a hotel in Los Angeles. Shepherd helped Holmes locate a man Holmes was looking for in order to purchase some cocaine. At that time, Shepherd introduced Holmes to Cooley, who then introduced Holmes to Brown.

Soon after the meeting in Los Angeles, Holmes met Shepherd at the apartment in Omaha that Fellows had rented. Holmes testified that it appeared Shepherd was living in the apartment. At this meeting, Holmes paid Shepherd for marijuana that Shepherd had sold him. About two weeks later, Holmes again met Shepherd at the apartment, where he received nine ounces of crack cocaine from Shepherd, packaged in single, plastic-wrapped packages. Holmes testified that Skannell was present in the apartment when he received this crack from Shepherd. Holmes took the crack, broke the packages down into quarter ounces, and sold them around Omaha. Once he sold all the crack, Holmes went back to the apartment and paid Shepherd $2,400.

Approximately two weeks later, Holmes again purchased nine ounces of crack from Shepherd, this time for $5,400, obtaining some of the crack on credit. After the crack was sold, Holmes returned to the apartment and paid Shepherd the amount he still owed. Holmes testified that Shepherd would make trips to Omaha from California and stay a few weeks, then be gone for two or three weeks, and then Shepherd would come back to Omaha, which supported Fellows' similar testimony. He testified he met with Shepherd approximately every two or three weeks at the apartment throughout the summer of 2001.

Holmes obtained crack a third time at the apartment in Omaha, this time from Cooley who had come into town from Los Angeles. Holmes watched Cooley and Brown cook the crack, and Holmes then bought nine ounces for $5,400. Shepherd and Skannell were not present on this occasion. About two weeks later, Holmes went back a fourth time to obtain crack, this time speaking with Shepherd. Holmes testified that he watched Shepherd cook powder cocaine into crack and that he then purchased nine ounces. Skannell and Cooley were also in the apartment while the cook occurred, which took about one or two hours. A couple of days later, Holmes went back to the apartment and purchased a few more ounces, this time from Cooley.

Sometime after July 4, 2001, Holmes purchased another nine ounces of crack at the apartment. This time, only Brown and Cooley were in the apartment and Brown handled the transaction. About two weeks later, Holmes saw Shepherd and Skannell at the apartment, but Holmes did not purchase any crack on that visit.

Holmes made another purchase of crack from Brown and Cooley in August 2001. Brown again handled the transaction, but Cooley was in the room at the time it occurred. Somewhere around this time, Brown informed Holmes that he could get cocaine cheaper if he bought it in Los Angeles. Toward the end of September 2001 Holmes drove to Los Angeles and purchased 18 ounces of powder cocaine from Brown. Holmes drove back to Omaha, and a few days later met Brown and Straughan at an apartment that Holmes had rented, where they cooked the 18 ounces of powder into 24 ounces of crack cocaine. Holmes kept nine ounces of the crack. Holmes testified that he rented this new apartment because the men wanted to get away from the old apartment. He estimated that Brown and Straughan stayed in the new apartment for about two weeks before leaving Omaha.

Holmes made another trip to California approximately two or three weeks after the first trip. On this trip, Holmes purchased a kilogram of powder cocaine from Brown. Holmes hid the packages in his car and then he and his cousin, along with two women, Danae Scott and Monique Noah, made the drive back to Nebraska. Holmes testified that he had seen the two women a few weeks earlier at the apartment in Omaha he had rented for Brown and Straughan. Back in Omaha, Brown, Straughan, and Holmes cooked 18 ounces of the powder into crack. Scott and Noah were present in the apartment while the cook occurred. Holmes sold the crack around the Omaha area. The next day Holmes returned to the apartment and obtained nine more ounces, which he sold for Brown and Straughan. About two or three weeks later, Brown, Noah, Scott, and Straughan left Omaha.

In November 2001 Holmes made a third trip to California, purchasing 1.5 kilograms of powder cocaine from Brown. Noah and Scott accompanied Holmes on the drive back to Omaha, along with a man named Latayo Clark. Holmes said that he had seen Clark before, in the apartment across from Fellows', cooking crack. On his way back to Omaha on this trip, Holmes was stopped on Interstate 80, the cocaine was discovered, and all four travelers were arrested.

Holmes testified that he received cocaine from other sources during this same time period. On one occasion he received two kilograms of powder cocaine from a different supplier and had Skannell cook it into crack for him. Holmes paid Skannell two or three ounces of crack for his help. In addition to the one apartment Holmes rented for Brown and Straughan, he testified that he rented a second apartment for them a few blocks away in October 2001. He visited the apartment soon after the second trip to California and saw Straughan, Brown, Scott, and Noah there. While Holmes never brought powder cocaine to this apartment, he testified that he did deal cocaine with others there. Holmes' cousin was the apartment manager of both complexes from which Holmes rented these apartments, and Holmes had arranged an "off the books" rental from his cousin. Holmes stated that while he never paid rent on the apartments, he saw both Cooley and Brown do so.

Vincent Brown also testified for the Government as part of a plea agreement. He had not yet been sentenced but was hoping that his cooperation would lead to a lower sentence. Brown testified that he knew all of the defendants, though by their street names. He stated that he also knew Holmes, whom he had met through Shepherd. Shepherd and Holmes were in Los Angeles, and Shepherd called Brown to ask him for marijuana for Holmes. Brown provided Holmes with approximately ten pounds of marijuana, for which Brown expected $2,500. At some point after receiving the marijuana from Brown, Shepherd and Holmes returned to Omaha. After he did not receive payment from Holmes or Shepherd, Brown traveled to Omaha. Upon his arrival, he called Shepherd, who told Brown to go to the apartment across

from Fellows', where he met with Holmes. Over the approximately one or two weeks Brown was in Omaha, Shepherd and Holmes paid Brown the $2,500 he was owed. Prior to leaving town, he talked to both Shepherd and Holmes about the possibility of bringing powder cocaine to Omaha, because they would make more money selling crack cocaine than selling marijuana.

Two weeks later, Brown came back to Omaha, bringing nine ounces of powder cocaine with him. He stayed for two weeks in the apartment across from Fellows'. Holmes paid Brown between $7,000 and $8,000 for the powder cocaine. The transaction occurred at the apartment, with both Shepherd and Cooley present. After Holmes paid Brown, Brown flew back to Los Angeles.

Brown made a third trip to Omaha sometime during the summer of 2001. On this trip, Cooley accompanied Brown, and they went to the same apartment in Omaha. Shepherd was there, and he and Brown cooked the cocaine that Brown brought with him into 24 or 26 ounces of crack, which they packaged into one-ounce packages. Holmes agreed to purchase the whole amount for $15,000. Once Brown received the full purchase amount from Holmes, he returned to Los Angeles.

Once back in Los Angeles, Brown purchased a kilogram of powder cocaine, which he then sold to Holmes, who had driven to California to obtain it. About two weeks later, Brown made his fourth trip to Omaha and went to the apartment across from Fellows'. Shepherd, Cooley, Holmes, and Fellows were there, and the men cooked the powder into crack. Holmes arranged to purchase the crack and sell it around Omaha, and then later paid Brown and Shepherd for it back at the apartment. Brown returned to California and arranged the acquisition of another 1.5 kilograms of powder cocaine. He again gave this to Holmes to drive back to Omaha, and Brown then later also traveled to Omaha. Brown went to the apartment Fellows had rented, where he met up with Shepherd, Holmes, Skannell, and Cooley. At the apartment, Shepherd and Brown cooked a kilogram of the powder into crack. Holmes took the

crack and sold it for Brown and Shepherd, paying them for it about two weeks later at the apartment. Brown returned to Los Angeles.

In Los Angeles, Brown bought another 1.5 kilograms of powder cocaine. Brown then drove to Omaha with Noah and Scott to an apartment that Holmes had arranged for the men to use. At the new apartment, Brown and Straughan cooked one kilogram of the powder into crack, again packaging the crack into one-ounce packages. Holmes sold the crack for the two men, paying them $22,000 for the total amount. Brown, Noah, and Scott flew back to Los Angeles after two or three weeks in Omaha. Soon after they returned to Los Angeles, Holmes made a trip to California to pick up another supply of powder cocaine from Brown. Brown stated that he did not make another trip to Omaha after giving the cocaine to Holmes on this occasion because he learned that Holmes, Scott, Noah, and Clark had been arrested on their way to Omaha.

In Brown's later testimony, he stated that on his fifth trip to Omaha, he and Straughan, along with Noah and Scott, went to the apartment Holmes had arranged because Brown and Shepherd had a falling-out over money and how to divide it between the two of them. He believed that the falling-out occurred on about his fourth trip to Fellows' apartment complex. He did not share the proceeds with Shepherd on the later trips to Omaha.

Monique Noah testified as a Government witness. She had also been indicted and was testifying as part of a plea agreement. She stated she had been sentenced to 37 months of imprisonment, but that the judge could lower her sentence. Noah testified that she knew all four of the defendants.

Noah was arrested when the police stopped Holmes on I-80. She testified that this trip was her third trip to Nebraska. The first trip was in September or October 2001 when she came with Cooley, Brown, Straughan, and Scott to Omaha. She

testified that she had a romantic relationship with Brown and met Cooley and Straughan through him, and that Danae Scott was her roommate. On this initial trip to Omaha, Noah testified that they first went to a hotel, where the men left the women for a few hours. Eventually Cooley came back and took Noah and Scott to the apartment Fellows had rented for the men. She and Scott stayed there about a week, along with Cooley, Straughan, and Brown. Noah testified that she was intoxicated the entire time she stayed in the apartment and that she smoked marijuana but did not consume any crack, powder cocaine, or methamphetamine. She claimed she was aware of her surroundings and what was going on the entire time. She stated she is familiar with both powder cocaine and crack but saw neither at the apartment. Noah met Holmes on this trip because he came to the apartment two or three times a day. When Holmes came to the apartment, he and Brown would go into the bedroom to talk, but Noah did not remember if Cooley or Straughan would join them. After a week or so, Brown told Noah it was time to leave, and Noah, Scott, Straughan, and Brown flew home. Noah purchased the tickets with money Brown had given her.

About a week or two later, Noah made her second trip to Nebraska. She and Scott drove to Omaha with Holmes and his cousin. Noah testified that Holmes had rented the van they rode in. They went to the same apartment in Omaha that they had stayed in before, but it had been completely cleaned out. Noah testified that Brown and Straughan were looking for Skannell to try to locate their furniture. They stayed in this apartment for three or four days, drinking and smoking marijuana. Holmes would make frequent visits to the apartment and would again go into the bedroom to talk with either Straughan or Brown. Noah did not see any powder cocaine or crack, any packing materials, or what she believed to be drug proceeds on this trip.

After a few days, Brown informed them that they had to leave the apartment. At this point, the group moved to an apartment about 10 minutes away, staying there about a week. Brown and Straughan had located Skannell and the missing furnishings, and they moved all the furniture and appliances from the old apartment

into the new one. Brown, Straughan, Scott, and Noah stayed at this apartment, and Holmes continued to make frequent visits. While Noah did not see any crack or powder cocaine here, she did see money, testifying that she saw cash in plastic bags leaning against a cabinet. She stated she saw two or three bags with four stacks of cash in each, and that she saw the bags on either the day before or the day they left to go back to California. Noah did not know to whom the money belonged. Noah testified that although she knew Shepherd from her time living in California and had seen him there, she had not seen him on any of her trips to Nebraska.

Danae Scott also testified for the Government as part of a plea agreement on the conspiracy charge. She had received a 120-month sentence and said that a judge could still reduce it. Scott knew all of the defendants, identifying them by their nicknames. She was also arrested on November 5, 2001, during the I-80 traffic stop, which was Scott's third trip to Nebraska.

Scott's testimony was very similar to Noah's. She testified that her first trip to Omaha was around September 2001 when she rented a van and made the trip with Brown, Cooley, Straughan, and Noah. The trip had been arranged by Brown. Scott echoed Noah's testimony that upon arriving in Omaha, the women were left at a hotel while the men went off, and that a while later Cooley came back and took them to an apartment, where they stayed for about a week. Scott stated that during this week she drank and smoked marijuana but not to the point where she did not remain aware of what was going on around her.

During the week they stayed in the apartment, Straughan and Brown would come and go, and other individuals would come to the apartment. Scott stated that the only individual she knew who visited the apartment was Holmes, because she had met him before in California. Whenever Holmes or the other men would come to the apartment, Brown and Straughan would take them into the bedroom to talk, and Scott was not aware of what they were discussing. Scott did not see powder cocaine or

crack at the apartment, but she did see measuring cups, in which crack is often cooked. In fact, on a different trip, Scott had purchased such measuring cups at the request of Brown and Straughan. Scott also saw money in a kitchen drawer, some of it wrapped in rubber bands. She had stumbled across the money looking for something in the drawer but quickly closed the drawer upon finding it because she did not want to be accused of snooping or stealing. Scott testified that after about a week in Omaha they flew back to Los Angeles.

Scott's second trip to Omaha was the drive with Holmes, his cousin, and Noah. She said that at first they went back to the same apartment and stayed there about two days, but the furniture was missing and Brown and Straughan were looking for Skannell because they thought he had it. During the two days they were in this apartment, Scott observed Brown and Straughan cook powder cocaine into crack. Noah was also in the apartment, but no one else was there at this time. After a couple of days, they moved to a second apartment in Omaha where they stayed about a week. At this second apartment, Scott saw Straughan and Brown hide a bag containing an off-white substance under the dishwasher. She also stated that the same male visitors would frequently come to the second apartment, including Holmes, and that upon arriving they would go into the bedroom to talk with Brown and Straughan. Scott did not see any money in this apartment. After about a week in Omaha, Brown bought plane tickets and Scott, Noah, Brown, and Straughan flew back to California.

Scott attempted to make a third trip back to Omaha, during which she was arrested. Scott never saw Shepherd in Nebraska, although she did hear Brown and Straughan talk about him. Scott saw Cooley in the first apartment at least once on her first trip to Omaha.

The jury found all of the defendants guilty of the conspiracy charge and the district court denied their postverdict motions. Each of the defendants filed an appeal, which we have consolidated.

## III.  Pretrial Matters

### A.  Bill of Particulars

Cooley alleges that the district court erred when it overruled his motion to preclude the Government from using the evidence disclosed in its second amended bill of particulars.  We review a district court's ruling regarding a bill of particulars for abuse of discretion.  See United States v. Hill, 589 F.2d 1344, 1352 (8th Cir.), cert. denied, 442 U.S. 919 (1979).

"A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, [and] to avoid or minimize the danger of surprise at trial."  United States v. Hernandez, 299 F.3d 984, 989-990 (8th Cir. 2002), cert. denied, 537 U.S. 1134 (2003).  It "is not to be used for discovery purposes."  Hill, 589 F.2d at 1352.  "A bill of particulars may be amended at any time subject to such conditions as justice requires."  Hernandez, 299 F.3d at 989; Fed. R. Crim. P. 7(f).  The original bill of particulars was filed in this case on October 3, 2003.  An amended one was filed on May 14, 2004, and then a second amendment was filed on May 18, 2004, one day before trial began.  Cooley objected to the government's use of the information from the amended bills of particulars, but his objection was overruled by the district court.

Several of the Government's witnesses entered into their plea bargains just before the trial was to begin.  As a result of these plea agreements and the information that the alleged coconspirators then provided to the Government, the Government amended the bill of particulars to reflect the new information that would be presented at trial.  In this case it was not a matter of the Government hiding information, as Cooley alleges, but of new information becoming available when certain codefendants and others chose to cooperate with the Government rather than proceed to trial.  See United States v. Olderbak, 961 F.2d 756, 763 (8th Cir.) (no error when it was clear that Government's amendments to the bill of particulars were "nothing more than the government's attempts to more accurately reflect the evidence which it intended to

prove at trial"), cert. denied, 506 U.S. 959 (1992). The charges against Cooley were made clear, and Cooley was able to adequately prepare for trial. The district court did not abuse its discretion, and Cooley has failed to show prejudice in the district court's decision to allow the evidence. See United States v. Wessels, 12 F.3d 746, 751 (8th Cir. 1993) (appellant was fairly and thoroughly apprised of the charges against him in the indictment and bill of particulars and failed to show prejudice), cert. denied, 513 U.S. 831 (1994); United States v. Kiser, 948 F.2d 418, 426 (8th Cir. 1991), cert. denied, 503 U.S. 983 (1992).

## B. Violation of Federal Rule of Criminal Procedure 5(a)

Shepherd argues that the district court erred by finding no violation of Rule 5 of the Federal Rules of Criminal Procedure occurred. He argues a violation of Rule 5(a)(1)(A) did occur because there was a 55-day delay between his arrest and his first appearance on the charge. Rule 5(a)(1)(A) requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). Prior to trial, Shepherd raised several Rule 5 issues, that the district court carefully reviewed, finding "that Rule 5 was complied with in all respects." (Appellant Shepherd's Add. at 10.) Only the issue of the delay between arrest and initial appearance is before us on appeal.

It is undisputed that Shepherd was indicted in Nebraska on October 24, 2002. It is also undisputed that Shepherd's first appearance on the indictment was April 30, 2003, in Los Angeles, California. What is disputed is the time line of events between March 6, 2003, and April 30, 2003. Upon the filing of the indictment, an arrest warrant for Shepherd was issued in the District of Nebraska on October 25, 2002. A Deputy United States Marshal signed the return showing the warrant as executed in Omaha, Nebraska, with the date of arrest being March 6, 2003. Shepherd argues that

because he was not brought before a magistrate until April 30, 2003, this 55-day delay between the date of arrest shown on the warrant's return and his appearance in California was unnecessary and that his indictment should have been dismissed with prejudice. However, the Government contends on appeal that the arrest warrant was mistakenly dated by the deputy marshal, and that Shepherd was in fact not taken into federal custody on the conspiracy charge until April 30, the day he made his first appearance. The Government points out that it makes little sense that Shepherd would have been arrested in Omaha within the District of Nebraska and then have had his first appearance in California.

The district court held that there was no violation of Rule 5. When considering a district court's ruling regarding a rule of criminal procedure, "we review the district court's legal conclusions de novo and its findings of fact for clear error." United States v. Van Horn, 296 F.3d 713, 719 (8th Cir. 2002) (internal marks omitted), cert. denied, 537 U.S. 1167 (2003).

The record surrounding when and where Shepherd was arrested for the crime charged in the indictment is less than crystal clear, but we conclude it is sufficient to support the district court's findings and conclusion that no Rule 5 violation occurred. When Shepherd filed his first motion for dismissal on October 22, 2003, he claimed that he had been wrongfully extradited from California because he had never been given a copy of the "arrest warrant, summons, detainer, or request . . . ," but he made no factual assertion as to when or where he was arrested on the indictment. (Filing No. 156 in the district court's docket.)

In its order entered on October 29, 2003, setting a briefing schedule on Shepherd's motion, the district court found the procedural background of the case to be that:

On February 26, 2003, Shepard [sic] was charged with violating a federal term of supervised release imposed as a result of a Colorado drug conviction. Shepard [sic] was imprisoned in Los Angeles as a result of the supervised release violation. On the basis of the instant indictment, on April 30, 2003, Shepard [sic] was arrested and appeared before Magistrate Judge Robert N. Block in the United States District Court for the Central District of California pursuant to Federal Rule of Criminal Procedure 40.

(Filing No. 178.)

In his Brief in Support of the Motion to Dismiss filed on November 19, (Filing Nos. 183, 185) Shepherd asserted the following as his version of the "Background," which is an almost word-for-word adoption of the district court's version of the facts surrounding his arrest on the indictment:

On February 26, 2003, Defendant was charged with violating a federal term of supervised release imposed as a result of a Colorado drug conviction. The defendant was imprisoned in Los Angeles as a result of the supervised release violation. On the basis of the instant indictment, on April 30th, 2003, the defendant was arrested and appeared before Magistrate Judge Block in the United States District Court for the Central District of California pursuant to federal Rule of Criminal Procedure 40.

(Filing No. 183.)

It is noteworthy that Shepherd made no claim in his brief that the district court had erred in its facts, and he made no assertion that he had actually been arrested on the indictment in Omaha, Nebraska, some weeks earlier, specifically on March 6, 2003, even though he had been furnished a copy of the returned Nebraska warrant ten days before filing his brief. Certified copies of the proceedings held in the Central District of California and filed in the District of Nebraska confirm that he was arrested

-18-

at 0700 hours on April 30, 2003, on the Nebraska warrant and made his appearance in federal court before Magistrate Judge Block later that day when counsel was appointed to represent him and he was ordered to be detained.

In its order of December 19, 2003, denying Shepherd's motion to dismiss and concluding that "[a]fter careful review, the Court finds that Rule 5 was complied with in all respects," the district court found that the defendant was arrested in California and appeared before Magistrate Judge Block on April 30, 2003, relying on the certified copies of the California proceedings. (Filing No. 204.) Although the district court's order also recites that the "warrant also reflects that it was properly executed on Shepherd by a United States Marshal on March 6, 2003," the district court made no finding of fact concerning the veracity of that return, and the district court's specific finding that the defendant was arrested in California on April 30 is an implicit rejection of the warrant's return's recitation that the defendant was arrested in Omaha on March 6, 2003. (Id.) The copy of the Nebraska warrant used in the California proceeding on April 30, 2003, does not show it as having been previously executed in Omaha on March 6, 2003.

The fact that the defendant was involved in supervised release revocation proceedings in the Central District of California is confirmed by paragraph 86 of Shepherd's Presentence Investigation Report (PSR), and the fact that he was imprisoned as a result thereof is also confirmed by Shepherd's own statement in his district court brief. It was only after the district court denied his motion to dismiss and mentioned the conflicting dates of arrest that Shepherd first ascribed that he had been actually arrested on March 5, 2003, (not on March 6) in his renewed motion to dismiss. (Filing No. 210.) Even then he did not assert that his alleged arrest on March 5 had occurred in Omaha or that it was because of the indictment. In fact, he specifically argued that the alleged March 5 arrest was "without warrant or complaint." (Id.)

Even more revealing is Shepherd's brief in support of his renewed motion to dismiss. In that document, he states that on September 6, 2002, he was arrested for possession of a firearm, and that a "United States Marshal hold" was placed on him at the same time. (Filing No. 212.) Paragraph 97 of the PSR reveals that on August 6, 2002, (thirty days earlier) he had been charged in Los Angeles County Superior Court with possession of a firearm by a felon. Hence his arrest on September 6, 2002, had to have been for the state charge. The United States Marshal's "hold" he alleges was placed on him the same day could not have been based upon the existence of the Nebraska warrant because that warrant was not issued until October 25, 2002, following the indictment. Shepherd's brief also states that he was already being confined in the Los Angeles County Jail on October 25, 2002. Paragraph 97 of the PSR reveals that Shepherd was acquitted by a jury of the California state weapons charge on February 25, 2003. Shepherd's initial district court brief (quoted *supra* at 18) confirmed that he was charged the very next day, February 26, 2003, with violating his federal supervised release. In his later district court brief he states that he was still being held in the Los Angeles County Jail on March 5, 2003, when he says he was arrested and taken to the Metropolitan Detention Center (a federal facility) by United States Marshals. Paragraph 86 of the PSR discloses that his federal supervised release was revoked on April 21, 2003, and that he was sentenced to serve ten months in prison. Hence, we are of the view that the arrest by United States Marshals which Shepherd claims occurred on March 5, 2003, was an arrest in furtherance of the federal supervised release revocation proceedings then pending against him in the Central District of California and was not an arrest made pursuant to the District of Nebraska's warrant issued for the crime charged in the Nebraska indictment.

Given the record disclosed before us, we cannot say that the district court's finding that Shepherd's initial arrest on the indictment occurred in California on April 30, 2003, is clearly erroneous, nor can we say that the district court erred when it concluded that no Rule 5 violation occurred.

**C. Speedy Trial Issues**

**1. Straughan**

Straughan alleges that the district court erred by not dismissing the indictment against him because the Government violated both the Speedy Trial Act and his Sixth Amendment right to a speedy trial. "Sixth Amendment and Speedy Trial Act challenges for delay are reviewed independently of one another." United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002).

"In the context of the Speedy Trial Act, we review the district court's findings of fact for clear error and the district court's legal conclusions de novo." United States v. Williams, 408 F.3d 1073, 1075-76 (8th Cir. 2005). The Speedy Trial Act requires that a defendant be brought to trial within 70 days from the date of indictment or from the date he makes his first appearance before an officer of the court in which the charge is pending, whichever is later. 18 U.S.C. § 3161(c)(1); Sprouts, 282 F.3d at 1042. Periods of delay caused by pretrial motions, whether filed by the defendant, codefendants, or the prosecution, are excluded from the calculation of this 70-day time frame, 18 U.S.C. § 3161(h)(1)(F); United States v. Fuller, 942 F.2d 454, 457 (8th Cir. 1991), cert. denied, 502 U.S. 914 (1991); 502 U.S. 10039 (1992), as are continuances granted by the court in order to best serve "the ends of justice," § 3161(h)(8)(A).

Almost seventeen months passed between Straughan's arraignment in January 2003 and the beginning of the trial in May 2004. Despite this delay, the district court found that there was no Speedy Trial Act violation due to the numerous pretrial motions filed in this case, including the 50-plus motions that Straughan's codefendant Shepherd filed, and the fact that the time during which those motions were pending did not count against the 70 days allowed under the Act. Thus, the district court determined that the Speedy Trial Act clock had not run out. On appeal, Straughan's only argument as to the Speedy Trial Act is that time excluded due to the motions

filed by his codefendants should not toll Straughan's Speedy Trial Act clock. Straughan contends that because he did not file pretrial motions himself and cause a delay in the trial date, his clock should have continued to run. That, however, is not the law, and thus we find no error in the district court's calculation and determination that the Speedy Trial Act was not violated. See Fuller, 942 F.2d at 457 ("Motions filed by one defendant in a multi-defendant case count as motions filed by all the defendants, and . . . will count as excludable time for all defendants.").

As to the separate Sixth Amendment speedy trial claim, we have stated that "[i]t would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not." United States v. Titlbach, 339 F.3d 692, 699 (8th Cir. 2003). The Sixth Amendment right "attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." United States v. Perez-Perez, 337 F.3d 990, 995 (8th Cir.), cert. denied, 540 U.S. 927 (2003). We consider a four-factor ad hoc balancing test when evaluating a Sixth Amendment claim for pretrial delay, considering such factors as: "[1] [l]ength of delay, [2] the reason for the delay, [3] the defendant's assertion of his [speedy trial] right, and [4] prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530 (1972); Titlbach, 339 F.3d at 699. "A delay approaching a year may meet the threshold for presumptively prejudicial delay requiring application of the Barker factors." Titlbach, 339 F.3d at 699.

At 17 months, Straughan's delay compels us to look to the other factors in the balancing test. Barker, 407 U.S. at 530 (noting that the length of delay is a "triggering mechanism" for the inquiry into the other factors). Although Straughan only filed one pretrial motion, his codefendants filed over 50 motions, causing extensive delay in bringing the case to trial. We do not find the time it took to dispose of these motions to be an unreasonable intrusion on Straughan's due process rights. See Fuller, 942 F.2d at 457. Further, there is no evidence that the Government intentionally caused any delay or filed pretrial motions to cause delay in order to gain a tactical advantage.

Looking to the third factor, while Straughan did file a motion to dismiss based on a speedy trial violation, he waited until the first day of trial to do so. Straughan made no attempt to have his case brought to trial sooner, nor did he file a motion to sever his case from that of the codefendants. See United States v. Brown, 325 F.3d 1032, 1035 (8th Cir.) (weighing the third factor against the defendant where the defendant did not inquire about his case or request a speedy trial), cert. denied, 539 U.S. 953 (2003).

The fourth factor, prejudice, is evaluated "in the light of the interests of defendants which the speedy trial right was designed to protect . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired . . . the most serious is the last." Barker, 407 U.S. at 532. Straughan does not allege that his defense was impaired by the delay. Rather, he claims oppressive pretrial incarceration kept him from seeing his children and caused him anxiety. Anxiety, without concurrent prejudice to the defendant's ability to mount a defense, is likely the weakest interest served. See id. at 534 (noting that "living for over four years under a cloud of suspicion and anxiety" was minimally prejudicial); Morris v. Wyrick, 516 F.2d 1387, 1391 (8th Cir.) ("Anxiety and concern of the accused are undoubtedly present to some degree in every case. . . [h]owever, that alone does not establish prejudice where. . . the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific circumstances."), cert. denied, 423 U.S. 925 (1975).

Looking at the record before us and applying the Barker test, we agree with the district court's judgment that Straughan's Sixth Amendment right to a speedy trial was not violated. That the delay was caused in large part by the filing of pretrial motions by Straughan's codefendants, that he did not assert his right prior to the day of trial, and that he did not show any impairment to his defense all weigh against the finding of a violation of the Sixth Amendment. As such, we affirm the district court's

-23-

judgment that there was no Speedy Trial Act violation or Sixth Amendment speedy trial violation as to appellant Straughan.

## 2.  Shepherd

Shepherd also claims a violation of the Speedy Trial Act and contends that the indictment against him should have been dismissed.  He argues that the 55 days between the date on the arrest warrant's return and his appearance in Los Angeles should be included in the Speedy Trial Act determination, which, if added to the 17 days the district court determined had run, would make the first day of trial past the 70-day limit.  However, the 55 days occurred well before the date of Shepherd's arraignment in the District of Nebraska, and we have held that the Speedy Trial Act clearly requires that "'a federal criminal defendant must be brought to trial within seventy days of the filing of his indictment or his arraignment, <u>whichever is later</u>.'" <u>United States v. Gamboa</u>, 439 F.3d 796, 804 (8th Cir. 2006) (emphasis added) (quoting <u>United States v. Yerkes</u>, 345 F.3d 558, 561 (8th Cir. 2003)); <u>see</u> <u>also</u> 18 U.S.C. § 3161(c)(1) ("the trial of a defendant charged in an . . . indictment . . . shall commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.").  Shepherd does not otherwise challenge the district court's determination that only 17 days had run on his speedy trial clock prior to trial commencing in May 2004.  His only argument is that the 55 days prior to his appearance in Los Angeles should be included in the calculation.  Because we have already decided that the district court's fact-finding that his arrest on the indictment occurred on April 30 (and not on March 5) is not clearly erroneous and because the alleged 55 days clearly fall outside the statute, they are not included in the Speedy Trial Act calculation, and Shepherd's claim fails.

## IV. Trial Issues

### A. Officer Orsi's Testimony

Cooley contends that the district court erred when it allowed the Government to present the expert testimony of Officer Steve Orsi because the Government had not complied with the disclosure requirements of Federal Rule of Criminal Procedure 16. Rule 16 requires that upon the defendant's request, the Government must provide a written summary to the defendant of "any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G). The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Id. If the government fails to comply, the district court may order the government to disclose the evidence, grant a continuance, prohibit use of the evidence at trial, or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

The Government decided to call Officer Orsi as a fact witness one week prior to trial. He was listed on the Government's witness list that was provided to the defense, but not on its expert witness list. While a summary of his testimony was not provided to the defendants in compliance with Rule 16, the Government did provide the defense with copies of Officer Orsi's prior, similar trial testimony. At trial, Officer Orsi was allowed to testify as an expert regarding drug investigations and related activities. Cooley objected to Officer Orsi's testimony based on both the lack of a Daubert hearing and a violation of Rule 16, but the district court overruled his objections. Only the Rule 16 violation is before us on appeal. "We review for an abuse of discretion alleged violations of Federal Rule of Criminal Procedure 16(a)(1)(G)." United States v. Conroy, 424 F.3d 833, 838 (8th Cir. 2005).

We have previously held that it is not an abuse of a district court's discretion to permit an officer to testify as an expert, particularly in narcotics cases, even if Rule

16 has not been fully complied with. See United States v. Londondio, 420 F.3d 777, 788-89 (8th Cir. 2005) (holding any potential evidentiary errors to be harmless); United States v. Ortega, 150 F.3d 937, 943-44 (8th Cir. 1998) (noting "that this type of expert evidence has become almost routine in drug cases" and finding no prejudice from the lack of Rule 16 disclosure), cert. denied, 525 U.S. 1087 (1999). In addition, we note in this case that while specific Rule 16 notice was not provided to the defendants, they were provided notice that Officer Orsi would be testifying and were given copies of his prior, similar testimony. Even if Cooley was unaware that Officer Orsi would be testifying in an expert capacity at trial, he was made aware of the nature of Officer Orsi's testimony. Cooley has failed to show any prejudice from this lack of notice. United States v. Anderson, 446 F.3d 870, 875-76 (8th Cir. 2006) ("'A claim of prejudice based on untimely disclosure is less convincing when unaccompanied by an objection to the object of that disclosure.'"), petition for cert. filed, __ U.S.L.W. __ (June 6, 2006) (No. 05-11436). We conclude that the district court did not abuse its discretion in allowing Officer Orsi to testify as an expert witness despite the lack of Rule 16(a)(1)(G) notice.

### B. Sufficiency of the Evidence

Each of the four appellants challenges his conviction claiming there is insufficient evidence to support the jury's verdict. "'This court reviews the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict.'" United States v. Katz, 445 F.3d 1023, 1028 (8th Cir. 2006) (quoting United States v. Kelly, 436 F.3d 992, 996 (8th Cir. 2006)). When reviewing the evidence in conspiracy cases, we have held that while a defendant may be convicted for even a minor role in a conspiracy, "the government must offer enough evidence to prove a defendant's connection to a conspiracy beyond a reasonable doubt before a conspiracy conviction can be upheld." United States v. Lopez, 443 F.3d 1026, 1028 (8th Cir. 2006) (en banc), petition for cert. filed, __

U.S.L.W. __ (July 5, 2006) (No. 06-5151). Evidence to prove participation in a conspiracy may be either direct or circumstantial, and we will affirm if the record "contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." Id. at 1030. Having discussed the trial evidence in great detail *supra*, we will not repeat it here. We hold that there is sufficient evidence to support the conspiracy conviction of each appellant.

In order to convict on a conspiracy charge, the Government must prove that each defendant "(1) had an agreement to achieve an illegal purpose, (2) knew of the agreement, and (3) knowingly became part of the agreement." United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006). There need not be "direct evidence of an explicit agreement" between the coconspirators, "a 'tacit-understanding' . . . may be, and often will be, inferred from circumstantial evidence." Id.

All four appellants challenge the sufficiency of the evidence on appeal by arguing that a number of the witnesses who testified against them had credibility problems, and thus their testimony should not be considered. However, the fact that certain witnesses had plea agreements with the government and were hoping to receive reduced sentences based on their cooperation were facts the jury was made aware of and could consider when weighing their testimony. "[W]e are obliged to defer to the jury's determination of the credibility of the witnesses," Lopez, 443 F.3d at 1031, and we will not second-guess the jury's credibility determination of the Government's witnesses in this case, see United States v. Vinton, 429 F.3d 811, 817 (8th Cir. 2005) ("Testimony is not unreliable as a matter of law just because a witness is a co-conspirator or a cooperating witness[]."); United States v Drapeau, 414 F.3d 869, 877 (8th Cir. 2005) ("'Testimony does not become legally insubstantial because the witness stands to gain by lying; the defendant is entitled to cross-examine such witnesses to expose their motivations, and it is up to the jury to decide whether the

witness is telling the truth despite incentives to lie.'"), <u>cert. denied</u>, 126 S. Ct. 1090 (2006); <u>United States v. Payne</u>, 940 F.2d 286, 291 (8th Cir. 1991) ("The existence and contents of . . . [a] plea agreement were precisely the sort of thing that affected the weight of [the] testimony, not its admissibility, and furthermore provided abundant material for impeachment and cross-examination."), <u>cert. denied</u>, 502 U.S. 994 (1991); 503 U.S. 972 (1992).

Construing any credibility challenges in the light most favorable to the verdict, <u>Vinton</u>, 429 F.3d at 815, we conclude that the evidence against Shepherd was more than sufficient to support the conspiracy conviction. Multiple witnesses testified regarding Shepherd's role in arranging a location to cook cocaine into crack, participating in cooks on multiple occasions, arranging for the sale of the drugs, and taking a share of the proceeds of those sales. This, in addition to the other evidence presented at trial, provided ample evidence for a jury to find beyond a reasonable doubt that Shepherd was guilty of participating in a conspiracy to distribute cocaine base.

Straughan's conspiracy conviction is also sufficiently supported by the evidence. Witnesses testified that Straughan was part of the group that transported powder cocaine from California to Omaha, that he participated in cooking cocaine on multiple occasions, that he helped arrange to have certain amounts of the crack sold that he had helped to cook, and that he made requests for drug-making supplies to be purchased. That evidence is more than sufficient for a reasonable jury to find that Straughan was guilty on the conspiracy charge.

In addition to the witness credibility argument, Skannell also argues on appeal that the Government failed to show that he was anything more than a bystander at the apartment while drug activities may have been occurring, and that mere presence is not enough to support his conspiracy conviction. <u>See</u> <u>United States v. Rodriguez</u>, 414

F.3d 837, 845 (8th Cir. 2005) (recognizing that "mere presence at the scene of a crime" does not establish participation in a conspiracy). However, looking at the evidence against Skannell as a whole, and the inferences it generates, the evidence is sufficient to support the jury's verdict. Specifically, there was testimony that Skannell participated in multiple cocaine cooks, that he did at least one cook on his own, that he accepted crack in exchange for doing a cook, and that he was observed giving money to Shepherd on multiple occasions. There was sufficient evidence to show that Skannell was aware that the conspiracy existed and that he was a knowing and active participant in the drug activities and the conspiracy, not just a mere bystander. See id. (rejecting claim of mere presence based on testimony of coconspirators).

The evidence against Cooley supports his conviction as well. Witnesses testified that not only was he present in the various apartments while the drug activities were occurring, but that he delivered packages which the jury could reasonably infer contained drugs to Shepherd multiple times, that he passed money to Shepherd, that he helped with cocaine cooks and went along to purchase supplies for these cooks, that he paid rent for one of the apartments in which the coconspirators conducted the drug transactions and cooked the crack, that he traveled with the coconspirators who transported the cocaine between California and Omaha, and that on at least one occasion he gave several ounces of crack to Holmes to sell. The evidence before the jury was sufficient for it to find beyond a reasonable doubt that the Government had met its burden in establishing the conspiracy elements as to Mr. Cooley.

We find that the evidence was sufficient for the jury to convict, and we affirm the conspiracy convictions as to all four appellants.

## C. Jury Instructions

Shepherd argues that the district court erred when it failed to instruct the jury on the law applicable to withdrawal from a conspiracy. Shepherd concedes that he did not object to the instructions given to the jury at submission and that he did not ask for such an instruction. Nonetheless, he contends that it was plain error for the district court to fail to give the withdrawal instruction. See United States v. Tobacco, 428 F.3d 1148, 1150 (8th Cir. 2005) (standard of review). We respectfully disagree.

"In order to withdraw from a conspiracy, a defendant 'must demonstrate that he took affirmative action to withdraw from the conspiracy by making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators.'" United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003) (quoting United States v. Zimmer, 299 F.3d 710, 718 (8th Cir. 2002)). Simply ceasing to be an active participant in the conduct of the conspiracy alone is not enough to establish a withdrawal from the conspiracy. Id.

Shepherd never went to the police regarding the conspiracy, and there is no indication that he voluntarily ceased his activities with the group. While there appears to have been a falling out among some of the coconspirators and this may have changed or reduced Shepherd's role, that itself does not establish that Shepherd took any affirmative steps to voluntarily withdraw himself from the conspiracy and then clearly communicated that fact to his coconspirators. See id. at 648-49 (affirming district court's refusal of an instruction on withdrawal from a conspiracy where the evidence established only that the conspirators had a falling out). A withdrawal instruction was not warranted, and the district court did not err in failing to instruct sua sponte on withdrawal.

## D.  Exclusion of Evidence

Skannell argues that the district court erred when it excluded specific evidence and testimony from being used to attack Holmes' credibility.  Specifically, Skannell refers to a 2004 Omaha World-Herald article, which the district court prevented the defense from introducing into evidence or discussing during the trial.  "'We review the district court's evidentiary rulings for abuse of discretion.'"  Katz, 445 F.3d at 1031-32 (quoting Urbina, 431 F.3d 305, 311 (8th Cir. 2005)).

The article in question referred to a state homicide trial in which Holmes was a witness and was cooperating with the state.  (Appellant Skannell's Add. at 9.)  The article quoted police investigators, who stated that Holmes had provided information about a homicide to the state, hoping to have his federal sentence reduced.  (Id.) Skannell's intent was to use the article to attack Holmes' credibility and to show that he "lied about the reason for his cooperation . . . and that he's also testifying in order to get a shorter jail sentence."  (Trial Tr. at 1019.)  The jury was already well aware of the fact that Holmes was testifying pursuant to a plea agreement and with the hope of receiving a sentence reduction because of his cooperation.  The article involved a separate state homicide case that did not pertain to the case at hand and would not have provided new information regarding Holmes' motivation for testifying.  The district court did not abuse its discretion by sustaining the Government's objection to the admission of the article, where the evidence was at most cumulative of other evidence before the jury.  See United States v. Gianakos, 415 F.3d 912, 914 (8th Cir) (affirming exclusion of cumulative evidence), cert. denied, 126 S. Ct. 764 (2005).

## V.  Post-Trial Issues
### A.  Motion for New Trial/Brady Violation

Straughan and Skannell both contend that the Government withheld information from them in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that the district court should have granted them a new trial based on this newly-discovered evidence. The Brady claim is based upon Holmes' testimony in August 2004 (more than two

months after the trial in this federal case) in a state homicide trial for the murder of Demond Briggs. Holmes testified as a prosecution witness about his own involvement in the Briggs murder and about his involvement with the accused. Straughan filed a motion for a new trial postsentencing, which the district court denied. Skannell raises the <u>Brady</u> claim for the first time on appeal. "We review the district court's denial of [Straughan's preserved] motion for a new trial based on a <u>Brady</u> claim for an abuse of discretion," <u>United States v. Gary</u>, 341 F.3d 829, 832 (8th Cir. 2003) (internal marks omitted), <u>cert. denied</u>, 540 U.S. 1139 (2004), and Skannell's claim for plain error, <u>United States v. Rouse</u>, 410 F.3d 1005, 1010 (8th Cir. 2005).

"To prove a <u>Brady</u> violation, a defendant must show that the prosecution suppressed the evidence, the evidence was favorable to the accused, and the evidence was material to the issue of guilt or punishment." <u>United States v. Duke</u>, 50 F.3d 571, 577 (8th Cir.), <u>cert. denied</u>, 516 U.S. 885 (1995). This includes both impeachment and exculpatory evidence. Evidence is considered material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Id.</u> (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)). If the "conviction was obtained through the prosecution's knowing use of perjured testimony," then the standard is slightly different and the conviction "'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Id.</u> (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).

During Holmes' cross-examination in the instant drug trial, the following exchange occurred between Holmes and Skannell's counsel:

Q: Is it true you're also facing other possible charges right now?
A: No.
Q: You're not aware of any potential murder charges that you may be a witness in?

A: A witness but not facing.

Q: Okay. So there's apparently to your knowledge a case out there dealing with a murder of somebody that you may be – have some information or knowledge about?

A: Yes.

Q: Okay. Has the government talked to you about this case?

A: No.

(Trial Tr. at 284.)

Straughan and Skannell claim that by allowing Holmes to testify that the Government had not discussed the Briggs homicide with him, the Government allowed Holmes to commit perjury, because in his later testimony at the Briggs trial, Holmes testified that he had spoken to the federal government about a homicide. (Appellant Straughan's Add. at 16.) However, a reading of Holmes' testimony from both trials convinces us that Holmes was talking about two different homicide investigations, the Briggs homicide and one that occurred in an apartment on Maple Street, and thus there was no perjury and no <u>Brady</u> violation. When Holmes testified at the federal drug trial, he was asked about the Briggs state homicide case in which he was involved as a witness. There are no records that indicate that at any time he spoke with anyone from the federal government about the Briggs homicide. In fact, he did not contact state authorities with his information about the Briggs murder until after his plea agreement with the Government on the drug charges was in place. Prior to that time, while making his proffer about the drug conspiracy, Holmes made a statement to the FBI about the Maple Street homicide, but it was not a homicide in which he was later considered to be a witness because he was incarcerated at the time the Maple Street homicide occurred. At the time of his testimony in the case on appeal here, Holmes was referring to the Briggs homicide case in which he was scheduled to testify and in which he was cooperating with state authorities, not the Maple Street murder that he spoke with federal agents about at his proffer interview.

Thus, we conclude he did not commit perjury when he stated that the Government had not spoken with him about the Briggs homicide.

Straughan and Skannell further allege that even if there was no perjury, it was a <u>Brady</u> violation for the Government not to disclose to the defense that Holmes was involved in a homicide investigation, specifically claiming that the details of Holmes' involvement in the Briggs murder, which Holmes testified to after the federal trial, should have been disclosed. The defense was aware prior to trial that Holmes was somehow involved in the Briggs homicide investigation. There is no indication that the Government was aware of the details and extent of Holmes' involvement in the Briggs homicide until the time he testified in the state trial, and "[a]ny knowledge gained by the prosecution *after* the trial is irrelevant to a <u>Brady</u> claim." <u>Rouse</u>, 410 F.3d at 1010.

No <u>Brady</u> violation occurred. As such, both Straughan's and Skannell's claims fail and the district court did not abuse its discretion in denying Straughan's motion for new trial.

### B. Motion for New Trial/Miscarriage of Justice

Cooley contends that the district court erred when it denied his motion for a new trial without granting him an evidentiary hearing. "We will reverse a district court's denial of a motion for a new trial only if the court clearly abused its discretion such that a serious miscarriage of justice may have occurred." <u>United States v. Ryder</u>, 414 F.3d 908, 915 (8th Cir. 2005). "The district court has broad discretion in deciding whether to hold a hearing," and generally hearings are only held when exceptional circumstances exist. <u>United States v. Provost</u>, 921 F.2d 163, 164 (8th Cir. 1990), <u>cert. denied</u>, 499 U.S. 968 (1991). Cooley's arguments for a new trial are simply a cumulative summary of the arguments he has raised earlier in this appeal. We have already addressed those arguments *supra*, and because none of them has any merit, we conclude that the district court did not abuse its discretion in denying Cooley's motion

for a new trial without holding an evidentiary hearing.  See United States v. Rice, 449 F.3d 887, 893-94 (8th Cir. 2006).

## VI.  Sentencing Issues

### A.  Skannell

Skannell was sentenced by the district court to 360 months of imprisonment. He was sentenced post-Blakely[2] but pre-Booker[3] and preserved a Blakely claim.  On appeal, Skannell specifically challenges the district court's calculation of drug quantity, its failure to grant him a downward departure, its failure to grant him a reduction for acceptance of responsibility, and its finding that he was a career offender under § 4B1.1 of the United States Sentencing Guidelines (USSG).

We begin with Skannell's challenge to the district court's finding that he was a career offender for purposes of USSG § 4B1.1.  He is a career offender for sentencing purposes if: (1) he was at least eighteen years old when he committed the instant offense, (2) the instant offense is a felony controlled substance offense, and (3) he has at least two prior felony convictions that were crimes of violence or controlled substance offenses.  USSG § 4B1.1(a).  Skannell does not quarrel with the validity of his prior felony offenses, but argues only that the district court violated Booker when it made its own fact-findings that his prior convictions satisfied § 4B1.1.  As we have recognized several times, however, Booker did not change the fact that the existence *vel non* of prior felony convictions are matters for the district court to determine, not fact issues for the jury.  See United States v. Levering, 431 F.3d 289, 295 (8th Cir. 2005) ("Almendarez-Torres is still good law, which we will continue to follow until the Supreme Court instructs otherwise."), cert. denied, 126 S. Ct. 2366 (2006).  Under the post-Booker regime, the district court properly considered Skannell's prior offenses and found him to be a career offender under § 4B1.1.

---

[2]Blakely v. Washington, 542 U.S. 296 (2004).

[3]United States v. Booker, 543 U.S. 220 (2005).

The career offender Guideline requires the district court to make a separate offense level calculation based on the statutory maximum sentence for the offense of conviction and to use that offense level if it is higher than the otherwise applicable offense level. "A career offender's criminal history category in every case under this subsection shall be Category VI." USSG § 4B1.1(b). Before proceeding to apply the career offender Guideline, the district court had determined that Skannell's total offense level, based on drug quantity and various other enhancements, was a level 28. The jury had returned its verdict form finding that the amount of crack cocaine involved in the conspiracy was 50 grams or more. Pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), that jury finding exposed Skannell to a statutory sentencing range of not less than ten years and a maximum of life in prison. Accordingly, with a statutory maximum of life in prison, Skannell's career offender offense level becomes a level 37. USSG § 4B1.1(b)(A). Thus, the district court properly used the career offender Guideline to calculate Skannell's Guidelines range because that Guideline resulted in a higher offense level, and the resulting 360 months to life Guidelines range is correct for a Level 37, Category VI offender.

Although the district court violated <u>Booker</u>, Skannell's challenge is rendered moot by the requirements of § 4B1.1 to apply the higher offense level under that section.[4] Because the judge's quantity and enhancement findings were trumped by the career offender Guideline, the district court did not violate Skannell's Sixth Amendment rights in sentencing him based on an offense level of 37 with a criminal history category of VI under USSG § 4B1.1.

---

[4]The district court violated <u>Booker</u> only because the district court understandably applied the Guidelines as mandatory (which they were at that time). Had the district court had the benefit of <u>Booker</u> and applied the Guidelines as advisory, the district court would have committed no error in making its own drug quantity findings by a preponderance of the evidence. <u>See</u> <u>United States v. Pirani</u>, 406 F.3d 543, 551 n.4 (8th Cir.) (en banc), <u>cert.</u> <u>denied</u> 126 S. Ct. 266 (2005).

The Sentencing Guidelines allow a reduction in offense level for acceptance of responsibility even after a finding that a defendant is a career offender. See USSG §§ 3E1.1; 4B1.1. "This [c]ourt gives great deference to the district court's denial of a request for a reduction for acceptance of responsibility and reviews the decision for clear error." United States v. Long Soldier, 431 F.3d 1120, 1122 (8th Cir. 2005). While Skannell claims that he was entitled to a three-level reduction in his Guidelines offense level of 37 for acceptance of responsibility, there was no error in the district court's rejection of his claim. Despite the last-minute plea negotiations that occurred between Skannell and the Government, Skannell ultimately chose to proceed to trial on the merits of the case and allow the jury to determine his guilt. In addition, the court noted that Skannell waited until the eve of trial to approach the Government about a possible plea agreement rather than to accept responsibility in the long, pretrial time period, which would have preserved both government and court resources. Skannell has provided no basis to support his claim that the district court's decision was clearly erroneous.

Finally, the district court specifically recognized its ability to depart based on an overstated criminal history under USSG § 4A1.3 but chose not to do so. This decision is unreviewable pursuant to 18 U.S.C. § 3742. United States v. Morell, 429 F.3d 1161, 1164 (8th Cir. 2005).

Skannell further argues that the district court erred in considering his prior convictions because the Government failed to file an Information pursuant to 21 U.S.C. § 851. Section 851 was enacted to ensure that defendants received notice before the statutory minimum sentence they could receive was enhanced based upon their prior convictions. United States v. Auman, 920 F.2d 495, 497 (8th Cir. 1990). Skannell's mandatory minimum sentence of ten years was not enhanced based upon his prior convictions (it was set by the jury's quantity determination), and "[i]n 'situations in which the defendant is assigned a guideline base offense level and receives an increased sentence, which is within a statutory range[,]' Section 851 has

no application." Id. (quoting United States v. Wallace, 895 F.2d 487, 490 (8th Cir. 1990)). Because Skannell's sentence was determined by the career offender Guideline and it fell within the maximum statutory range of life in prison, § 851 has no application to his sentencing, and the district court could determine the existence of his prior convictions for career offender Guideline purposes unencumbered by the procedural requirements of § 851.

As noted *supra*, although the district court calculated the proper career offender Guidelines sentencing range, acting pre-Booker, it understandably applied the Guidelines as mandatory. Skannell preserved this issue by making a Blakely argument in the district court, which requires that we review for harmless error. See Pirani, 406 F.3d at 549. The district court rejected the Blakely challenge and applied the Guidelines as mandatory. Because the district court's only Booker error was the mandatory application of the Guidelines, the error was not of constitutional magnitude, and the government bears the burden of establishing that the error did not substantially influence the outcome of the proceedings. United States v. Olthoff, 437 F.3d 729, 732 (8th Cir. 2006). In other words, the government must prove that the district court would have imposed the same sentence if it had treated the Guidelines as advisory.

The district court sentenced Skannell to 360 months of imprisonment, the bottom of the applicable range. Booker requires the district court to treat the Guidelines as advisory, and to consider all of the relevant sentencing factors contained in 18 U.S.C. § 3553(a). Although the district court denied Skannell's motion for a downward departure based on an overstated criminal history, that says nothing about what the district court would have done had it considered all of the § 3553(a) sentencing factors while treating the Guidelines as advisory. "We cannot determine on the record before us that it was harmless error for the district court to sentence [Skannell] under a mandatory guidelines scheme." United States v. Mendoza-Mesa, 421 F.3d 671, 673 (8th Cir. 2005). Accordingly, we must vacate Skannell's sentence

and remand for resentencing under Booker, using the career offender 360 to life range as the correctly determined advisory Guidelines range.

### B. Shepherd

Shepherd was also sentenced post-Blakely but pre-Booker and preserved a Blakely challenge at sentencing. The district court determined that Shepherd was a career offender under § 4B1.1. Shepherd claims error in the district court's drug quantity finding, its determination that he was a career offender, its determination of his criminal history, and its imposition of an enhancement for being a leader or organizer. Based on the district court's drug quantity findings and the other Guidelines enhancements, the district court determined a total offense level of 41 and a criminal history category of VI, resulting in a Guidelines range of 360 to life.

Like Skannell, Shepherd challenges the district court's finding that he was a career offender on the sole basis that the prior felony convictions should have been found by the jury under Booker. We reject his challenge for the same reasons we rejected Skannell's challenge above, and we affirm the district court's finding that Shepherd was a career offender under USSG § 4B1.1.

Unlike Skannell, the district court's career offender finding does not moot Shepherd's challenge to the district court's drug quantity findings or its application of a role-in-the-offense enhancement. The district court determined an offense level of 41 based on the drug quantity and other enhancements, which was higher than the career offender level of 37 determined under § 4B1.1. Thus, the district court's drug quantity and role findings were not mooted by § 4B1.1, which sets a level 37 only if the otherwise applicable offense level is lower than a 37. The government concedes that the district court's drug quantity findings, coupled with the mandatory application of the guidelines, violated Shepherd's Sixth Amendment rights under Booker. (Appellee's Br. at 79.) Because the error was constitutional, the government bears the higher burden of establishing that the error was harmless beyond a reasonable doubt.

See Mendoza-Mesa, 421 F.3d at 673. The government cannot meet its burden on this record. Shepherd received a sentence at the bottom of the applicable range, and the district court made no other remarks that convince us beyond a reasonable doubt that had it known that it could impose a non-Guidelines sentence based on the factors contained in § 3553(a), it would have imposed the same sentence.

Accordingly, Shepherd's sentence is vacated and the case is remanded for resentencing. On remand, the district court's career offender finding stands resulting in an offense level of 37, as does its use of a Criminal History Category of VI, which results in a correct advisory Guidelines range of 360 to life under the career offender Guideline. See United States v. Brown, 408 F.3d 1049, 1052 (8th Cir. 2005) ("Because classification as a career offender automatically results in a criminal history classification of Category VI . . . we will not consider whether errors were made in calculating [the defendant's] criminal history points."); United States v. Alvarez, 254 F.3d 725, 728 (8th Cir. 2001) (using criminal history category of VI based on finding that defendant was a career offender even if higher offense level was used than minimum set by career offender status); USSG § 4B1.1(b). If the district court finds it necessary to do a non-career offender based advisory Guidelines calculation, the district court may make its other sentencing findings based on a preponderance of the evidence. See United States v. Thorpe, 447 F.3d 565, 569 (8th Cir. 2006). We note in passing that the career offender based advisory Guidelines range, and the range the district court initially determined using a drug quantity determination and other Guidelines based adjustments, both ultimately result in the identical Guidelines range of 360 months of imprisonment to life.

### C. Cooley

Cooley was sentenced post-Blakely but pre-Booker by the district court to life in prison. He raises a *pro se* Booker challenge to the district court's finding that he was a career offender. Because Cooley made a Blakely objection prior to sentencing,

his objection was preserved for appeal. However, <u>Booker</u> does not apply in Cooley's situation because Cooley was not sentenced pursuant to the Guidelines. Cooley's sentence was determined by the mandatory sentence set forth by statute based upon his prior felony convictions and the jury's finding beyond a reasonable doubt that the conspiracy involved 50 or more grams of cocaine base. <u>See</u> 21 U.S.C. § 841(b)(1)(A)(iii) (setting mandatory sentence at life in prison for 50 gram offender with two prior felony drug convictions); <u>Levering</u>, 431 F.3d at 295; <u>United States v. Vieth</u>, 397 F.3d 615, 620 (8th Cir.), <u>cert. denied</u>, 125 S. Ct. 2560 (2005). Because it was proper for the district court alone to make the factual determinations regarding Cooley's prior felonies and his sentence was mandated by statute, there was no <u>Booker</u> error, and the sentence is affirmed.

### D. Straughan

Straughan was sentenced post-<u>Booker</u> to 360 months of imprisonment. He preserved his <u>Booker</u> challenge at sentencing and raises it again on appeal, arguing that his sentence was unreasonable and that the district court failed to properly consider the factors under 18 U.S.C. § 3553(a). He makes no challenge to the calculation of the applicable advisory Guidelines range of 360 years to life. "We review the reasonableness of a sentence for an abuse of discretion," and we have held that sentences within the Sentencing Guidelines are presumptively reasonable. <u>United States v. Vasquez</u>, 433 F.3d 666, 670 (8th Cir. 2005), <u>petition for cert. filed</u>, __ U.S.L.W. __ (Apr. 11, 2006) (No. 05-10381). However, a presumptively reasonable sentence may still be found unreasonable "if the sentencing court: (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." <u>Id.</u> at 671.

Nothing indicates that the district court based Straughan's sentence on an "improper or irrelevant factor," or "failed to consider a relevant factor." <u>See id.</u> Instead, the district court recognized its right under <u>Booker</u> to sentence outside the

-41-

Guidelines, determined the proper, applicable advisory Guidelines range, chose a sentence at the low end of that range, and then justified that sentence by specific reference to the § 3553(a) factors. See United States v. Cadenas, 445 F.3d 1091, 1095 (8th Cir. 2006) ("While not making explicit findings with respect to each, the record reflects that the district court recognized its obligation to consider the § 3553(a) factors and did actually consider them in determining the appropriate sentence."); United States v. Dieken, 432 F.3d 906, 909 (8th Cir. 2006) (holding that the district court is required to fully consider the § 3553(a) factors when determining sentence, but need not "categorically rehearse each . . . on the record . . . as long as it is clear that they were considered"), petition for cert. filed, __ U.S.L.W. __ (June 15, 2006) (No. 05-11598). Straughan has failed to rebut the presumption of reasonableness that attaches to a sentence imposed post-Booker that is within the Guidelines range, and we affirm the district court's judgment as to Straughan.

## VII. Conclusion

Accordingly, we affirm each appellant's conspiracy conviction, and we affirm the judgments of the district court with respect to appellants Cooley and Straughan. We vacate the sentences of Shepherd and Skannell and remand their cases to the district court for resentencing in accordance with Booker and this opinion.

_____