# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1059

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Ronald Titlbach, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 10, 2003

Filed: August 7, 2003

_____

Before MORRIS SHEPPARD ARNOLD and RILEY, Circuit Judges, and BOGUE,[1] District Judge.

_____

RILEY, Circuit Judge.

A jury found Ronald Titlbach (Titlbach) guilty of conspiring to manufacture and distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine and distributing 12.61 grams of a mixture or substance containing a detectable amount of methamphetamine within 1000 feet of a school in violation of 21 U.S.C. §§ 841, 846, 851 and 860. Based on the jury's findings, the

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

district court[2] sentenced Titlbach to life imprisonment for conspiracy and 960 months imprisonment for distribution.[3] On appeal Titlbach challenges the sufficiency of the evidence on the amount of methamphetamine and whether he acted after June 6, 1999, in furtherance of the conspiracy. Titlbach also challenges the admission of evidence found at a co-conspirator's residence and alleges a violation of his right to a speedy trial. We affirm the conviction, but remand for resentencing on Count 3.

## I.    BACKGROUND

Several significant events mark Titlbach's over two-year conspiracy to manufacture and distribute methamphetamine.[4] The following are the relevant facts adduced at trial, which are relevant on this appeal. After responding to a suspicious house fire on May 5, 1998, in Waterloo, Iowa, law enforcement discovered a methamphetamine laboratory (Kroeger lab). Titlbach was at the Kroeger lab during the fire, but fled before emergency personnel arrived. Titlbach supplied Donald Kroeger (Kroeger) with stolen anhydrous ammonia in exchange for methamphetamine.[5] Some time before the fire, Kroeger taught Titlbach and Jack

---

[2]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa. Trial was held before the Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa. Judge Melloy has since been appointed United States Circuit Judge for the Eighth Circuit and currently serves in that capacity.

[3]Although not raised by Titlbach, the government admits the sentence on Count 3 for distribution near a school exceeds the maximum sentence under the statute, which is 720 months. See 21 U.S.C. § 841(a)(1), 841(b)(1)(C), 851 and 860.

[4]We discussed additional facts, not relevant to this appeal, in the case of Titlbach's former wife and co-defendant, Susan Titlbach, in United States v. Titlbach, 300 F.3d 919 (8th Cir. 2002).

[5]Co-conspirator Kroeger was tried separately and convicted. United States v. Kroeger, 229 F.3d 700 (8th Cir. 2000).

Bruce (Bruce) how to manufacture methamphetamine using the anhydrous reduction method.

In March 1999, law enforcement executed a search warrant at Robert Symonds's (Symonds) home, finding a methamphetamine laboratory in a garage (Symonds lab).[6] Titlbach used the Symonds lab in exchange for methamphetamine. Symonds watched Titlbach manufacture methamphetamine on five occasions, but knew Titlbach used the lab on other occasions because of the debris and methamphetamine left there. Titlbach manufactured methamphetamine in the Symonds lab on approximately ten occasions making one to one-and-a-half ounces each batch.

On April 6, 1999, law enforcement, with the assistance of Lloyd Cinkan (Cinkan), conducted a controlled purchase from Titlbach of 12.61 grams of a mixture containing methamphetamine. Cinkan purchased the methamphetamine at a Sun-Mart grocery store located less than 500 feet from an elementary school.

On May 31, 2000, Titlbach and Lenora Shipp (Shipp) were arrested after law enforcement discovered drug-related paraphernalia in their vehicles. Officers were conducting a routine inspection of vehicles in a hotel parking lot when they noticed Shipp's vehicle had local license plates. A check determined Shipp had an outstanding warrant. Shipp had rented a room in cash under an alias. At one point, law enforcement answered Shipp's cellular telephone and the caller identified himself as "Ron." While searching Shipp's vehicle, officers noticed another suspicious vehicle and followed it. Titlbach was driving the second vehicle, but when stopped he initially gave the name of Billy Shipp.

---

[6]Symonds pled guilty to manufacturing methamphetamine. United States v. Symonds, 260 F.3d 934 (8th Cir. 2001).

On May 11, 1999 an indictment charged Titlbach with distributing 12.61 grams of a mixture containing methamphetamine within 1000 feet of a school on April 6, 1999. The case was dismissed on October 20, 1999, because the government could not locate Cinkan, a material witness on the charge. On April 13, 2000, Titlbach was reindicted for the April 6 distribution (Count 3), charged with witness tampering, and, along with co-defendants Susan Titlbach and Joseph Anderson (Anderson), charged with conspiracy to manufacture and distribute 50 grams or more of methamphetamine (Count 1). Anderson committed suicide on December 19, 2000. The Titlbachs went to trial on February 27, 2001. The jury returned a guilty verdict on Counts 1 and 3, and acquitted Titlbach of witness tampering. The district court sentenced Titlbach to life imprisonment, and sentenced him to a concurrent 960-month sentence on Counts 1 and 3, respectively. This appeal followed.

## II.  DISCUSSION
### A.  Sufficient Evidence of Quantity

We review de novo the sufficiency of the evidence to sustain a conviction. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002). "[W]e look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." Id. (citation omitted). We will reverse only when the jury verdict lacks substantial evidence to support it. Id.

The jury, by special verdict, found Titlbach conspired to manufacture and distribute 50 grams or more of actual methamphetamine. The jury's finding subjected Titlbach to a mandatory life sentence pursuant to 21 U.S.C. § 841(b)(1)(A). Titlbach argues the trial testimony does not support the jury's finding of quantity. We disagree.

Although contested by Titlbach, we conclude the district court properly found (1) the Kroeger lab evidence to be relevant, and (2) the methamphetamine amounts from the Kroeger lab reasonably attributable to Titlbach. See discussion *infra*. A

chemist's testimony at trial substantiates a finding that the Kroeger lab was capable of producing a maximum theoretical yield of 510 grams of actual methamphetamine, based on empty precursor containers. Additionally, based on samples from the Symonds lab, there was a maximum theoretical yield of 23 grams of actual methamphetamine per batch. Symonds testified he saw Titlbach cook methamphetamine on five occasions, but knew of at least five other occasions when Titlbach used Symonds's property to cook methamphetamine in one to one-and-a-half ounce batches. The chemist testified that, based on the samples and other studies, the practical yield of methamphetamine would be 40-50% of the maximum theoretical yield. When viewed most favorably to the verdict, the Kroeger and Symonds labs had practical yields of at least 200 grams and 90 grams of actual methamphetamine, respectively. Were the jury to use the practical yield percentage urged by Titlbach of 21%, the labs would have produced practical yields of 100 and 48 grams, respectively.

In addition to the two labs, trial testimony connected Titlbach to the following amounts: (1) at least 16 grams of a mixture of methamphetamine sold to Cinkan; (2) at least 10 grams of a mixture of methamphetamine witnessed by Albert McMurrin; and (3) more than 11 grams of actual methamphetamine seized from Shipp. In addition, many witnesses testified about ongoing methamphetamine purchases from Titlbach or his acquiring of precursors such as anhydrous ammonia or ephedrine.

Based on our review of the evidence, and viewing such evidence in the light most favorable to the verdict, substantial evidence supports the jury's special verdict holding Titlbach responsible for conspiring to manufacture and distribute 50 grams or more of actual methamphetamine.

### B.     Sufficient Evidence of Conspiracy

We also review the sufficiency of the evidence to sustain the conspiracy conviction de novo. Cruz, 285 F.3d at 697. "[O]nly slight evidence connecting a

defendant to the conspiracy may be enough to sustain a conviction. The government need only prove that [the defendant] tacitly agreed to participate in the conspiracy and that he intended its unlawful goal." United States v. Causor-Serrato, 234 F.3d 384, 388 (8th Cir. 2000) (citations omitted). Titlbach contends he was no longer a member of the conspiracy after his arrest in May 1999.

The jury found, by special verdict, Titlbach committed an act in furtherance of the conspiracy after June 6, 1999–the date when Titlbach's second prior felony drug conviction became final, making a life sentence mandatory for the current conviction pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 846.[7] Titlbach argues the jury could not have found he committed an act in furtherance of the conspiracy after June 6, 1999. We disagree.

Two significant events allow a jury to infer Titlbach acted in furtherance of the conspiracy after June 6, 1999. First, following Titlbach's arrest on May 19, 1999, he was housed with Robert Zoll (Zoll) in the Linn County Jail. Zoll testified he and Titlbach exchanged recipes for manufacturing methamphetamine.

Second, Titlbach and Shipp were arrested on May 31, 2000. At that time, officers discovered 18 lithium batteries, many coffee filters, walkie-talkies, road flares, bullets, a black powder pistol, acetone, methamphetamine, marijuana, an electronic scale, and large sums of cash in Titlbach's and Shipp's vehicles. Both Shipp and Titlbach provided false information to officers during the stops. Shipp had also registered into a hotel near her home under an alias and paid cash for the room. Before being stopped, Titlbach drove slowly and furtively past Shipp's stopped vehicle, then called Shipp's cellular telephone. After his arrest, Titlbach admitted to

---

[7]Titlbach was convicted on February 28, 1992, in Linn County District Court of manufacturing marijuana, and on May 6, 1999, in Tama County District Court of possession with intent to deliver methamphetamine for conduct which occurred on September 12, 1998.

Investigator George Aboud (Agent Aboud) that he was still manufacturing methamphetamine. While Titlbach now argues the confession implicates him in manufacturing only, and not to the continued conspiracy, the evidence could reasonably lead the jury to infer Titlbach continued with the conspiracy after June 6, 1999.

### C. Evidence of the Kroeger Lab

"We review the evidentiary rulings of a district court for abuse of discretion, keeping in mind that its discretion is particularly broad in a conspiracy trial." United States v. Jordan, 260 F.3d 930, 932 (8th Cir. 2001) (internal citations omitted). "Evidence that a coconspirator participated in acts which furthered the conspiracy constitutes substantive evidence of the conspiracy's existence. Such evidence is probative of the crime charged . . . ." United States v. Maynie, 257 F.3d 908, 915 (8th Cir. 2001) (internal citation omitted).

Titlbach argues evidence from the Kroeger lab should have been excluded at trial as irrelevant to his charges. Alternatively, Titlbach argues the evidence was unduly prejudicial and confusing to the jury, and should have been excluded under Federal Rule of Evidence 403. Titlbach argues the government was unable to link the working methamphetamine lab to him.

Having reviewed the record, we conclude the district court did not abuse its broad discretion in admitting the Kroeger lab evidence. Law enforcement discovered the Kroeger lab after a fire on May 5, 1998. An Iowa state law enforcement Special Agent, Scott Green (Agent Green), testified Titlbach's business card was found in Kroeger's wallet shortly after the fire. Agent Green also testified an unidentified man left the scene of the fire before the Waterloo Police Department arrived. Bruce testified Titlbach told him Titlbach was at the Kroeger lab during the fire, but left before the fire department arrived. Also, Bruce and Jeff Armstrong testified Titlbach learned to cook methamphetamine from Kroeger using the anhydrous method in late

-7-

1997 or early 1998. Agent Aboud testified Titlbach admitted to stealing anhydrous eight or nine times and supplying anhydrous to Kroeger or to Anderson, who also supplied it to Kroeger. Titlbach also admitted to receiving small amounts of methamphetamine from Kroeger for stealing anhydrous. Based on this evidence, the district court did not abuse its discretion in admitting the Kroeger lab evidence as relevant and probative.

### D. Speedy Trial
#### 1. Speedy Trial Act

"In the context of the Speedy Trial Act, we review the district court's findings of fact for clear error and the district court's legal conclusions de novo." <u>United States. v. Van Someren</u>, 118 F.3d 1214, 1216 (8th Cir. 1997). "If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by [the excluded delays of] section 3161(h), the information or indictment <u>shall</u> be dismissed on motion of the defendant." <u>United States v. Blankenship</u>, 67 F.3d 673, 675 (8th Cir. 1995) (quoting 18 U.S.C. § 3162(a)(2)). Essentially, a defendant must be brought to trial within 70 days of his indictment or first appearance, whichever is later. 18 U.S.C. § 3161(c)(1). However, certain periods of time may be excluded. <u>See</u> 18 U.S.C. § 3161(h); <u>see also</u> <u>United States v. Perez-Perez</u>, No. 03-1459, slip. op. at 4 (8th Cir. July 30, 2003). Additionally, "the dismissal of the first indictment temporarily stops the running of the 'speedy trial clock.'" <u>United States v. Leone</u>, 823 F.2d 246, 248 (8th Cir. 1987) (citing 18 U.S.C. § 3161(h)(6)).

Titlbach was indicted on May 11, 1999, for distributing methamphetamine on April 6, 1999, within 1000 feet of a school. The May 1999 indictment was dismissed in October 1999 because of a missing witness, Cinkan. The distribution charge then became Count 3 of the April 13, 2000 indictment. Titlbach and his co-defendants also filed several pretrial motions.

Titlbach argues the time between his indictment and trial, less excludable time, was 71 days. Specifically, Titlbach argues the time taken for pretrial motions which did not delay the trial date should not be excluded under the Act. We disagree. The Act excludes

> Any period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . (F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.

18 U.S.C. § 3161(h)(1)(F).

Under subsection F, "[a]ny pretrial motion, including a motion for extension of time, is a pretrial motion . . . and creates excludable time, even if it does not in fact delay trial." United States v. Arbelaez, 7 F.3d 344, 347 (3d Cir. 1993); see United States v. Sawyers, 963 F.2d 157, 162 (8th Cir. 1992) (co-defendant's pretrial motions tolled clock); see also Henderson v. United States, 476 U.S. 321, 329-30 (1986) (holding delay from any pretrial motion is not limited to reasonably necessary delay). Titlbach failed to exclude time for his motion for an extension of time filed June 8 and resolved June 10, 1999; his motion to continue trial filed July 6 and resolved August 13, 1999; and his motion in limine filed on October 13, 1999, and not yet resolved when the case was dismissed. Therefore, Titlbach's claim fails.

### 2.    Sixth Amendment

It would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not. See United States v. Sprouts, 282 F.3d 1037, 1042 (8th Cir. 2002). We must consider four factors when applying a Sixth Amendment balancing test to pretrial delay: the length of delay, the reason for delay, whether the defendant asserted the right to a speedy trial, and whether the defendant suffered any prejudice. Barker v. Wingo, 407 U.S. 514, 530 (1972); see also Perez-Perez, slip. op. at 5.

Titlbach argues the total time he was detained on the first indictment was five months, and on the second was nearly eight months. Therefore, he suffered thirteen months delay. Titlbach claims the reason for the delay was not his fault because co-defendants, his counsel, the prosecution, and the court all contributed to the delay. Titlbach arguably asserted his right to a speedy trial by letter dated November 6, 2000. Titlbach claims he was prejudiced by the delay because one co-defendant died on December 19, 2000. The trial began February 27, 2001.

A delay approaching a year may meet the threshold for presumptively prejudicial delay requiring application of the Barker factors. See Doggett v. United States, 505 U.S. 647, 652 n.1 (1992); United States v. Walker, 92 F.3d 714, 717 (8th Cir. 1996) (37 month delay presumptively prejudicial); cf. United States v. Patterson, 140 F.3d 767, 772 (8th Cir. 1998) (five-month period between detention and trial on drug charges, interrupted by pretrial motions, "was not sufficiently long to be presumptively prejudicial"); United States v. McFarland, 116 F.3d 316, 318 (8th Cir. 1997) (delay just over seven months did not trigger Sixth Amendment analysis). Titlbach's first indictment related only to Count 3 of the instant indictment–distribution of methamphetamine near a school. Titlbach suffered a delay of only eight months with regard to Count 1–conspiracy to distribute methamphetamine. Given the complexity of the conspiracy and the length of trial, Titlbach did not suffer presumptive prejudice related to Count 1. Where no presumptively prejudicial delay existed, we need not examine the remaining three factors under Barker. Doggett, 505 U.S. at 651-52; Sprouts, 282 F.3d at 1043 (delay of 125 days).

As to Count 3, Titlbach suffered presumptive prejudice because the delay was thirteen months. The reason for delay can, in part, be attributed to Titlbach, because he and his co-defendants sought continuances at various times. Titlbach argues he was unaware his counsel sought continuances; however, such delay remains

attributable to him. <u>Stewart v. Nix</u>, 972 F.2d 967, 970 (8th Cir. 1992). There is no evidence the government sought delay for tactical advantage.

Finally, Titlbach asserts he was prejudiced by the death of his co-defendant, Anderson, who Titlbach alleges would have testified in his favor. Titlbach was charged alone in Count 3 of distributing methamphetamine near a school. The incident occurred when Titlbach sold methamphetamine under the scrutiny of law enforcement agents as part of a controlled buy. Titlbach alleges Anderson would have called into question the credibility of Cinkan, the person working with officers. The district court determined there was no indication co-defendant Anderson would have provided exculpatory information. We agree.

Because of the relatively short period of delay on Count 3 and because the <u>Barker</u> factors weigh against finding a Sixth Amendment violation, no violation of Titlbach's Sixth Amendment right to a speedy trial occurred.

## III. CONCLUSION

For the reasons stated above, we affirm Titlbach's conviction and life sentence on Count 1. We remand, however, to allow the district court the opportunity to correct Titlbach's sentence for Count 3, considering the statutory maximum of 720 months.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.