# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2533

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Nebraska. |
| Samson Aldaco, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 12, 2006
Filed: February 26, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

After a bench trial, Samson Aldaco was convicted of conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), and 846 and possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c). He appeals the district court's[1] denial of his motions to suppress evidence obtained from a search of his wallet two to three weeks after his arrest and from statements made to police four and five

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

days after his arrest; the denial of his motion to dismiss the indictment as violative of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, and his Sixth Amendment right to a speedy trial; and the denial of his motion for acquittal based on insufficiency of the evidence. We affirm.

I

On December 7, 2001, a sheriff's deputy in Omaha, Nebraska, stopped Aldaco for driving a vehicle, a Ford Mustang, without headlights after sunset. After being informed the Mustang might have been at the scene of a shooting earlier in the evening, officers conducted a high-risk stop. The occupants of the Mustang were arrested, firearms were recovered, and the vehicle was towed so it could be secured for a search after obtaining a search warrant. Later that day, officers obtained and executed a search warrant (not challenged in this appeal) which authorized the search of the Mustang. Along with other evidence seized, several wallets, including Aldaco's wallet, were taken from the glove compartment of the Mustang. Officer Leland Cass of the Omaha Police Department (OPD) testified at the suppression hearing he searched Aldaco's wallet "to determine who may have owned it" and discovered "ID papers and things of that nature." Suppression Hr'g Tr. 47-48, Apr. 2, 2003. Officer Cass's report of the search noted appellant's wallet was taken for safekeeping but did not note what was contained therein. Officer Cass testified he had seen identification and a birth certificate. Id. at 51.

Officer Cass did not consider the wallet to be evidence. He took the wallet to the OPD homicide office on December 7, 2001. Officer Bruce Ferrell, an investigator with the OPD gang intelligence squad, testified at the suppression hearing he looked through Aldaco's wallet on December 7, 2001, at the homicide office:

> At that point we had conducted an interview earlier in the day with an individual . . . who had indicated that Mr. Aldaco and others were involved in a multi-state narcotics investigation—or distribution network

of which we were going to begin an investigation. I was trying to determine if there was any intelligence that we could gather from that wallet as well as if there was any more information about individuals who may be witnesses or other suspects who had fled the scene of the homicide and had not yet been talked to by homicide.

Suppression Hr'g Tr. 78-79, Apr. 2, 2003. Officer Ferrell testified he reviewed all the paperwork found in and associated with Aldaco's wallet. He found "some papers that had some handwritten notes" but, at the time, the notes did not have any specific relevance to him. Id. at 79. He testified he took note of the phone numbers he had seen in the wallet. After review by homicide officers, the wallet was kept in a labeled, sealed envelope in a safe in the OPD homicide office from December 7–20, 2001; Officer Cass booked the wallet into the property room at the OPD on December 20, 2001.

On December 7, 2001, Officer Wayne Melcher conducted an interview of appellant regarding the shooting. The interview was videotaped. Officer Melcher shook hands with Aldaco, identified himself, and asked some biographical questions. He conducted the interview in English, and Aldaco appeared to have no difficulty understanding or speaking English. Officer Melcher advised him of his Miranda[2] rights, and Aldaco stated he understood them and agreed to talk with Officer Melcher. After the interview began, Officer Teresa Negron joined Officer Melcher and appellant in the interview room. The interview lasted approximately one and a half hours. During the interview, he did not appear to be under the influence of alcohol or a controlled substance, did not ask for an attorney, and did not ask for the questioning to stop. He was not promised anything nor was he threatened. The interview ended when Officers Melcher and Negron concluded their questioning.

Between December 7 and December 11, 2001, Aldaco was interviewed by an immigration services officer; he told the officer he wanted to speak with the homicide

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

detectives again. The immigration services officer informed Officer Negron as to Aldaco wanting to talk with Officer Melcher again.

On December 11, 2001, Officers Melcher and Negron went to the Douglas County Corrections facility and contacted Aldaco who affirmed he wanted to talk with them. Officers Melcher and Negron transported him to OPD Headquarters and talked with him in a videotaped interview. Aldaco informed them he had been appointed an attorney on state homicide charges but wanted to speak with them without the attorney present. Aldaco told the officers about his connection to the shooting and about some of his drug trafficking connections. He also stated he wanted to talk with OPD narcotics officers.

Aldaco was interviewed on December 12, 2001, by Officer Stephen Sanchelli, a narcotics investigator. Officer Negron contacted Officer Sanchelli regarding his request to speak with narcotics officers about methamphetamine distribution. Officer Sanchelli understood Aldaco was charged in a homicide case in which he was represented by an attorney but wanted to cooperate in the methamphetamine distribution investigation. Officer Sanchelli asked if the appellant had been advised of his Miranda rights and was told by Officer Negron that he had been so advised. The interview was conducted in English, and he had no difficulty communicating with Officer Sanchelli. Officer Sanchelli introduced himself, displayed his police badge, and stated he understood Aldaco wanted to talk with him regarding narcotics trafficking. Aldaco confirmed such was the case. He said it was his understanding there were no promises or deals for him, there were no threats to get him to interview with the officers, and the interview was initiated by him and given of his own free will. Officer Sanchelli told him in order for him to conduct the interview, Aldaco had to waive his right to self-incrimination and his right to an attorney. He stated he understood and waived those rights. During the interview he neither asked for an attorney nor asked for the questioning to stop. The questioning stopped when Officer Sanchelli concluded his questioning.

-4-

During the interview, Aldaco gave various names of individuals involved in drug trafficking. Following the interview, sometime between December 20 and 27, 2001, Officer Ferrell, who had been present for the December 12 interview, went to the OPD property room to review the contents of Aldaco's wallet. At the suppression hearing, Officer Ferrell explained why he went back to look at the wallet: "[T]o verify . . . what I thought I had seen and the notes that I had taken on the 7th" and "to verify that I had correctly taken down the information that I did on the 7th." Suppression Hr'g Tr. 80, 82, Apr. 2, 2003. As a result of this "second look" at the wallet, Ferrell discovered a notation of the name "Chuck Knight" and various telephone numbers which proved material to the criminal investigation.

On January 24, 2002, Aldaco, Dale Herman, and Charlie Knight were charged in district court with one count of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine; Aldaco was arraigned on February 20, 2002. A second count charging him with carrying a firearm in connection with the drug offense was added in a second superceding indictment; he was arraigned on the second count on March 7, 2005. On May 23, 2005, he waived his right to trial by jury, and a bench trial began on May 24, 2005. The district court denied his motion for acquittal. On November 9, 2005, the district court adjudged him guilty on Counts I and II of the second superceding indictment. On May 22, 2006, the district court sentenced him to a term of life on Count I and eighty-four months on Count II to be served consecutively. Judgment was entered on June 2, 2006, and this appeal followed.

II

A.     Motions to Suppress Evidence and Statements

Aldaco appeals the denial of his motions to suppress evidence obtained from the warrantless second search of his wallet two to three weeks after his arrest and from the statements made to police without having been read his <u>Miranda</u> rights on

December 11-12, 2001. When reviewing a denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions de novo. United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005).

       1.      Wallet Search

Aldaco does not challenge the initial seizure and search of his wallet in conjunction with the December 7, 2001, search of the Mustang pursuant to a valid search warrant. Instead, he argues once officers determined the wallet had no evidentiary value and logged it into personal property storage, the officers needed to obtain a search warrant or his consent to search the wallet a second time. Thus, he contends the district court erred in not suppressing the evidence found in the wallet and evidence derived from that evidence, namely the testimony of cooperating individuals who testified against him at trial.

Aldaco faults the district court's reliance on United States v. Lacey, 530 F.2d 821 (8th Cir. 1976), in denying his motion to suppress the contents of the wallet. In Lacey, the serial numbers of currency seized for safekeeping (not as evidence) were recorded as part of logging the property into police storage. The police later reviewed their log books and matched the serial numbers to currency used in a drug conspiracy. The Lacey court stated:

> After the currency had been lawfully discovered and removed by the DEA agents for safekeeping, Lacey could no longer reasonably expect any right of privacy with respect to the serial numbers. . . .
> . . . .
> There is no question in this case that the access of the DEA agents to the currency was lawful. We cannot say that the subsequent listing of the serial numbers of the currency as part of the inventory procedure invaded any reasonable expectations of privacy. We therefore hold that no unreasonable search or seizure occurred when the DEA agents simply transcribed into a permanent form serial numbers of currency which they had already lawfully observed.

Id. at 823-25. The Lacey court cited favorably the "second look" doctrine discussed in United States v. Jenkins, 496 F.2d 57, 72-74 (2d Cir. 1974), stating:

> [T]he Second Circuit [in Jenkins] held that the examination by the federal agent constituted a mere "second look" at property which had been fully exposed to the view of law enforcement officers at the time of its initial taking, and that therefore no reasonable expectations of privacy were invaded and no search occurred when the agent looked again at what had already been lawfully observed.

530 F.2d at 824.

Aldaco argues a more analogous case was presented in United States v. Gray, 484 F.2d 352 (6th Cir. 1973), where firearm serial numbers were recorded in the execution of a search warrant authorizing the search of a store and seizure of intoxicating liquors and items used in their manufacture. The serial numbers were used to charge the defendant with a firearm violation. The Sixth Circuit held the seizure of the serial numbers was illegal because the "plain view" doctrine was inapplicable to items the incriminating nature of which was not "immediately apparent." Id. at 355. Aldaco argues because Officer Ferrell went through his wallet on December 7, 2001, and did not find anything which stood out as evidence, the subsequent warrantless search of the wallet two or three weeks later while in OPD property storage was an unreasonable search in violation of his Fourth Amendment rights.

Aldaco's reliance on Gray is misplaced. Unlike in Gray, there is no contention here the initial search of the subject item was unlawful. The officers in Gray were not legally authorized to view the firearm serial numbers. Here the wallet was seized and searched pursuant to a valid search warrant. It is uncontested Officers Cass and Ferrell lawfully viewed the contents of his wallet on December 7, 2001.

The question is instead whether Officer Ferrell lawfully took a "second look" at the wallet given his initial assessment (on December 7, 2001) that the wallet did not contain evidence and given the "second look" took place two to three weeks after the initial assessment. Officer Ferrell viewed the entire contents of the wallet and took notes concerning handwritten phone numbers contained in the wallet on scraps of paper. On December 12, 2001, Aldaco provided the names of other individuals to Ferrell and another officer during an interview. This information put the information in his wallet in a new, evidentiary light. At the suppression hearing, Officer Ferrell explained he went back to look at the wallet to verify what he thought he had seen when he first viewed the contents of the wallet and to verify notes he had taken about what was in the wallet. See Suppression Hr'g Tr. 80, 82, Apr. 2, 2003.

Analogous facts were present in Lockhart v. McCotter, 782 F.2d 1275 (5th Cir. 1986). In Lockhart, an officer placed Lockhart's wallet in an inventory envelope and put the envelope in property storage as part of booking Lockhart for aggravated robbery (Lockhart was accused of stealing a wallet from another man at knifepoint). The wallet was inventoried as a "purse" and there was no indication in the record the "purse" was considered evidence. Several months after Lockhart's arrest, and while he remained in custody, the county prosecutor asked a police investigator to search Lockhart's property envelope to determine if the "purse" listed on the inventory sheet was in fact the wallet stolen during the robbery. The investigator seized the wallet from the police property room without Lockhart's consent. In reviewing whether Lockhart's attorney provided ineffective assistance of counsel by not objecting to the entry of the wallet into evidence, the Fifth Circuit found the warrantless search of the property envelope did not violate the Fourth Amendment. The Lockhart court stated:

> Contrary to Lockhart's assertion, however, no warrant was required prior to [the officer's] search of Lockhart's property envelope. In United States v. Edwards, 415 U.S. 800, 808, 94 S. Ct. 1234, 1239, 39 L. Ed. 2d 771 (1974), the Supreme Court stated:

once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest *may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed* between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. *This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial.* (emphasis added).

Under Edwards, no warrant was required when the police searched Lockhart's property envelope. The police had earlier, at the time of inventory, lawfully viewed the wallet contained in Lockhart's envelope. Because of this earlier police inspection of his personal property, Lockhart had only a diminished expectation of privacy with respect to the items contained in the envelope. See United States v. Grill, 484 F.2d 990, 991 (5th Cir.), cert. denied, 416 U.S. 989, 94 S. Ct. 2396, 40 L.Ed.2d 767 (1973) (no reasonable expectation of privacy is breached by an officer's taking a second look at the matter with respect to which the expectation of privacy has been at least partially dissipated). By taking a "second look" at the wallet without first obtaining a search warrant, the police did not unduly intrude upon whatever remaining expectation of privacy Lockhart had.

Lockhart, 782 F.2d at 1279-80. Similarly, we find nothing unreasonable about the second search of Aldaco's wallet where the police previously had lawfully discovered it and taken it for safekeeping. See Lacey, 530 F.2d at 823-24.

2.      Statements

Aldaco challenges the denial of his motion to suppress statements he made to investigators on December 11-12, 2001. He does not contest the district court's finding he was advised of, and acknowledged he understood, his Miranda rights on the day of his arrest, December 7, 2001. The United States concedes he was not read

his Miranda rights in a videotaped interview conducted on December 11, 2001. The United States contends the officer conducting the unrecorded interview on December 12, 2001, was told he had been read his Miranda rights prior to the videotaped interview but concedes the officer did not advise Aldaco of his Miranda rights.

"[A] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings." United States v. Withorn, 204 F.3d 790, 796 (8th Cir. 2000) (internal quotation omitted). After a review of the evidence produced at the suppression hearing, the magistrate judge concluded "the overwhelming evidence is that Aldaco initiated the request for reinterrogation by Officers Melcher and Negron" on December 11, 2001, concerning state homicide charges. These findings were adopted by the district court. There is no clear error in this factual finding. Thus, we affirm the district court's determination that "any common sense viewing of the videotape . . . shows that Aldaco voluntarily and willingly relinquished" his Fifth Amendment right to silence. The same result follows in reviewing the circumstances under which he made statements to OPD officers on December 12, 2001. He again initiated the interview, and there is no evidence his statements were provided under duress or were anything other than voluntary. Therefore, the district court's determination that "[u]nquestionably, Aldaco was well aware of his Fifth Amendment rights and voluntarily chose to waive them," is not clear error, and we affirm the district court's denial of his motion to suppress the statements.[3]

---

[3]Aldaco also moved in the district court to suppress his statements as violative of his Sixth Amendment right to counsel. Because Aldaco did not argue the right to counsel issue in his brief to this court, we deem the issue abandoned. See United States v. Joiner, 418 F.3d 863, 870 (8th Cir. 2005) (concluding, pursuant to Fed. R. App. P. 28, issues not raised in the opening brief are deemed abandoned).

B.    Speedy Trial Challenges

This case went to trial three years and four months after the original indictment was filed.  Aldaco contends the district court erred in denying his motion to dismiss the indictment as violative of the Speedy Trial Act and his Sixth Amendment right to a speedy trial.  We review the district court's findings of fact on whether a defendant's right to a speedy trial was violated for clear error but review its legal conclusions de novo.  See United States v. Van Someren, 118 F.3d 1214, 1216 (8th Cir. 1997).

1.    Speedy Trial Act

Under the Speedy Trial Act (Act), a federal criminal defendant must be brought to trial within seventy days of his indictment or arraignment (whichever is later).  United States v. Yerkes, 345 F.3d 558, 561 (8th Cir. 2003).  Certain days, however, may be excluded from the seventy-day calculation. After these days are excluded, if the total number of non-excludable days exceeds seventy, then the district court must dismiss the indictment upon the defendant's motion.  Yerkes, 345 F.3d at 561; see 18 U.S.C. § 3162(a)(2).  The defendant has the burden of proof to support the motion, with the exception of the exclusion of time under 18 U.S.C. § 3161(h)(3) concerning the unavailability of the defendant or an essential witness.  18 U.S.C. § 3162(a)(2).

Here, the district court denied Aldaco's motion based on: (1) his waiver of his speedy trial rights; and (2) the "facts of this case, in particular the numerous previous continuances granted, all of which were granted at his request and without any objection to orders waiving his speedy trial rights" and motions filed on his behalf at his direction.  He correctly points to the Supreme Court's recent decision in Zedner v. United States in challenging the premise he could have completely and indefinitely waived his rights under the Act.  126 S. Ct. 1976, 1987 (2006) ("[A] defendant may not prospectively waive the application of the Act.  It follows petitioner's waiver 'for all time' was ineffective.").  Therefore, the district court erred in relying on Aldaco's waiver of his rights under the Act to deny his motion.  Zedner also calls into question

-11-

at least some of the pro forma orders issued by the district court excluding periods of time from the calculation of the seventy-day period in which trial must commence. Id. at 1989 ("[A]n ends-of-justice continuance . . . must 'se[t] forth, in the record of the case, either orally or in writing, its reasons' for finding that the ends of justice are served and they outweigh other interests. . . . at the very least . . . by the time a district court rules on a defendant's motion to dismiss [for violation of the Act]." (quoting 18 U.S.C. § 3161(h)(8)(A))). But, in denying the motion, the district court also relied on numerous continuances and motions which toll the Act's time periods. Aldaco insists, even taking into account these continuances and motions, seventy-seven days occurring over four time periods were not excludable under the Act.[4] We disagree.

The days in the first two time-periods cited by Aldaco, June 30, 2003–July 3, 2003 (four days), and March 28, 2004–April 28, 2004 (thirty days), are all excludable because he or a co-defendant had motions pending that had not yet been heard by the district court. 18 U.S.C. § 3161(h)(1)(F) (expressly stating "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" shall be excluded in computing the time within which the trial must commence); see Henderson v. United States, 476 U.S. 321, 330 (1986) ("We . . . hold that Congress intended [18 U.S.C. § 3161(h)(1)(F)] to exclude from the Speedy Trial Act's 70-day limitation all time between the filing of a motion and the conclusion of the hearing on such motion, whether or not a delay in holding that hearing is 'reasonably necessary.'" (quoting the U.S. Senate Report on the 1979 amendments to the Act, S. Rep. No. 96-212, p. 34 (1979))).

The United States concedes at least thirteen days in the third time period, June 21, 2004–July 6, 2004 (fourteen days), should be counted toward the computation of the speedy trial clock but contends July 1, 2004, should be excluded as the court entered an order then. The United States cites no authority for excluding the date the

_____

[4]Aldaco conceded at oral argument a fifth period referenced in his brief did not include any excludable days.

-12-

order issued. Given the order issued more than thirty days after the court took the motions disposed of in the order under advisement on May 3, 2004, we conclude July 1, 2004, should not be excluded from the computation of the speedy trial clock. See 18 U.S.C. § 3161(h)(1)(J) (noting "delay reasonably attributable to any period, *not to exceed thirty days*, during which any proceeding concerning the defendant is actually under advisement by the court" must be excluded. (emphasis added)). Thus, fourteen days in this time period are included in computing the speedy trial clock.

The United States also concedes "some" of the thirty-one days in the fourth period challenged, March 7, 2005–April 7, 2005, could count against defendant's speedy trial rights but argues some of the days should be excluded because the court was still determining whether Aldaco was competent to stand trial. Since the record is unclear as to how many of the days should be apportioned to his competency evaluation, we attribute all thirty-one days in the fourth time period in computing the speedy trial clock. Still, in total, only forty-five of the seventy-seven days in the four periods cited by him cannot be excluded and no violation of the Act occurred.

As an alternative fourth period of exclusion, Aldaco challenges the district court's holding "in abeyance" his motion to dismiss for vindictive prosecution (filed on January 30, 2005) until the start of the trial (on May 24, 2005), a period of over a hundred days. Aldaco asserts:

> This Court should not exclude the entire period of time between defense counsel's Motion to Dismiss Count II for vindictive prosecution all the way up to trial. This would simply encourage district courts with loaded dockets to hold motions "in abeyance" for as long as it takes to accommodate the trial calendar. There is nothing in the record giving justification to . . . delay ruling on the motion, and the time should not be excluded from the speedy trial calculation.

Appellant's Br. at 33. The Act, however, does not allow for the inclusion of this entire alternative fourth period of time in calculating the speedy trial clock. The period from

-13-

the filing of the motion to dismiss for vindictive prosecution through to the date when the motion was scheduled to be heard (January 30, 2005–March 7, 2005) is excludable under 18 U.S.C. § 3161(h)(1)(F). Had the court actually heard the motion on March 7, 2005, rather than entering an order holding the motion in abeyance, the court would have had up to an additional thirty days to render a decision on the motion (by April 6, 2005). Two days after the expiration of this hypothetical advisement period, on April 8, 2005, Aldaco filed a motion to dismiss the case for violation of the Speedy Trial Act. This motion was denied on April 19, 2005. Twenty-two days later, on May 11, 2005, he then filed a motion for writ of habeas corpus ad prosequendum which was granted the next day. Aldaco's trial commenced twelve days later on May 24, 2005. Therefore, at best under his "what if" theory, thirty-six non-excludable days would be added to the fourteen non-excludable days in the third period (June 21, 2004–July 6, 2004), yielding a total of fifty non-excludable days, still within the seventy days allowed under the Act. Thus, even if the district court impermissibly held "in abeyance" his motion to dismiss for vindictive prosecution, no violation of the Act occurred.

### 2. Constitutional Speedy Trial Rights

Sixth Amendment challenges are reviewed separately from the Speedy Trial Act. United States v. Thirion, 813 F.2d 146, 154 (8th Cir. 1987). But this court has stated, "It would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not." United States v. Titlbach, 339 F.3d 692, 699 (8th Cir. 2003). The Sixth Amendment guarantees: "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const. amend. VI. The Sixth Amendment right "attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." United States v. Perez-Perez, 337 F.3d 990, 995 (8th Cir. 2003). The Supreme Court has identified four relevant inquiries in a claim involving the Sixth Amendment right to a speedy trial: (1) whether delay before trial was uncommonly long; (2) whether the government or the criminal defendant is more to blame for the delay; (3) whether, in due course, the defendant asserted his

right to a speedy trial; and (4) whether he suffered prejudice as a result of the delay. Doggett v. United States, 505 U.S. 647, 651 (1992). To trigger speedy trial analysis, the defendant must allege the interval between accusation and trial has crossed a line "dividing ordinary from 'presumptively prejudicial' delay." Id. at 651-52 (quoting Barker v. Wingo, 407 U.S. 514, 530 (1972)). This court has held a thirty-seven month delay is presumptively prejudicial. United States v. Walker, 92 F.3d 714, 717 (8th Cir. 1996); cf. Titlbach, 339 F.3d at 699 ("A delay approaching a year may meet the threshold for presumptively prejudicial delay . . . .").

Here, the delay of approximately three and a half years from date of arrest to trial is presumptively prejudicial delay which warrants a review of the four relevant inquiries into Aldaco's Sixth Amendment violation claim. First, we find the delay was uncommonly long. Second, we find most of the delay is attributable to him. Over the pendency of his case, he had six attorneys, primarily due to his desire for new counsel, and presented more than forty-five oral or written motions to the court. Third, he did reference his speedy trial rights on October 3, 2002, March 24, 2004, and moved to dismiss on speedy trial grounds on April 8, 2005. But at the same time he was referencing his speedy trial rights, he was filing motions that required evidentiary hearings (e.g., motions for change of venue and to rectify), and his attorneys were filing motions seeking extensions of time to file motions and prepare for trial. Additional delay occurred in adjudging his competency to stand trial and transporting him to and from locations necessary to get medical opinions concerning his competency.

Finally, we find Aldaco has made no showing of prejudice. "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532. He was arrested on state homicide charges on December 7, 2001, and detained from that point forward. He was convicted of murder in the first degree, use of a deadly weapon to commit a

felony, possession of a deadly weapon by a felon and possession of a controlled substance and sentenced on April 12, 2005, to life imprisonment. Thus, no matter what delay occurred on his federal charges, there was no oppressive pretrial incarceration based on these charges prior to his May 24, 2005, federal trial start date. To the extent he suffered any anxiety and concern, the delay allowed him to express his concern through six attorneys. Finally, he has not made any showing of how his defense was impaired by the lengthy delay. As a result, we find no showing of prejudice. Therefore, we conclude his Sixth Amendment rights were not violated by the length of his proceedings, and the district court did not err in denying his motion to dismiss the indictment.

      C.     Sufficiency of Evidence

According to Aldaco, the district court ignored much of the evidence he presented in his own defense. The district court stated: "I find the testimony of Samson Aldaco not credible. In support of this determination, I note the lack of corroboration of facts or other details testified to either through the testimony of other witnesses or evidence. I also observe that Aldaco has substantial motivation to provide false testimony." R. at 61 ¶ 25. Aldaco contends it was the cooperating witnesses the United States presented who were not credible. He asserts the evidence presented at trial was insufficient to convict him of the drug conspiracy charge and of carrying and using a firearm in the commission of the conspiracy charge.

     "This court reviews the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict." United States v. Kelly, 436 F.3d 992, 996 (8th Cir. 2006). A reversal of a conviction for lack of sufficient evidence is only proper where no reasonable juror could have concluded beyond a reasonable doubt the government met its burden of proof as to each element of the offense. United States v. Smith, 450 F.3d 856, 860 (8th Cir. 2006). "To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the

-16-

government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003). One carries a firearm in the commission of a conspiracy if the weapon is carried in a vehicle and need not be used in an affirmative manner. United States v. Freisinger, 937 F.2d 383, 387 (8th Cir. 1991). One uses a firearm in the commission of a conspiracy if the weapon is actively employed. Bailey v. United States, 516 U.S. 137, 147 (1995).

Other than his conclusory allegation the cooperating witnesses had an incentive to present evidence against him and his unsupported assertion the evidence presented was insufficient to convict him, Aldaco points to no specific weaknesses in the testimony or flaws in the verdict. Here, the evidence showed he personally distributed and supervised others who distributed drugs and traveled to Colorado, Kansas, and Nebraska to distribute these drugs. When police stopped him on December 7, 2001, they found methamphetamine and firearms in the Mustang he was driving. He admitted to distributing over thirty-three pounds of methamphetamine, and four cooperating witnesses testified they received methamphetamine from him and he had a supervisory role in the conspiracy. Finally, three cooperating witnesses testified firearms were located in the Mustang he was driving on December 7, 2001. Viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict, the above evidence is sufficient to support Aldaco's conviction on the drug conspiracy and firearms charges.

III

Accordingly, we affirm.

_____

-17-